295 F.2d 713
 T. M. EVANS and Josephine S. Evans
v.
Alexander J. DUDLEY, Individually, and as Former District Director of Internal Revenue.
United States of America, Intervenor, Appellant.
 No. 13559.
 United States Court of Appeals Third Circuit.
 Argued September 21, 1961.
 Decided November 8, 1961.
 
 Douglas A. Kahn, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Attorneys, Department of Justice, Washington, D. C., Hubert I. Teitelbaum, U. S. Atty., Daniel J. Snyder, Asst. U. S. Atty., Pittsburgh, Pa., on the brief), for appellant.
 C. McKenzie Lewis, Jr., Pittsburgh, Pa. (John A. McCann, McCann, Garland, Ridall & Burke, Pittsburgh, Pa., George D. Lockhart, N. K. Parker, Jr., Michael F. Butler, Kirkpatrick, Pomeroy, Lockhart & Johnson, Pittsburgh, Pa., on the brief), for appellee.
 Before GOODRICH, McLAUGHLIN and HASTIE, Circuit Judges.
 GOODRICH, Circuit Judge.
 
 
 1
 The United States appeals from a judgment of the District Court for the Western District of Pennsylvania ordering a refund to the taxpayer of money which he claimed was improperly collected from him. 1960, 188 F.Supp. 9.[1]
 
 
 2
 In 1954 the taxpayer, in two transactions, bought $2,000,000 worth of public utility bonds at a premium. These bonds had been issued prior to January 22, 1951, and were callable on thirty days' notice at a price lower than the purchase price. Mr. Evans put up $118,000 cash of his own and borrowed the remainder of the purchase price from the Mellon National Bank and Trust Company in Pittsburgh. That the loan was completely bona fide and represented an obligation from borrower to lender is not questioned. After holding the bonds for thirty days Mr. Evans, still in 1954, donated $1,250,000 face amount of the bonds to charities, $700,000 going to Yale University and $550,000 to the T. M. Evans Foundation on the condition that the charities assume the indebtedness on the bonds. No doubt is raised that each of these recipients was a proper subject of a charitable donation. The taxpayer, in his return for 1954, took a deduction under Section 171 of the Internal Revenue Code of 1954 by way of amortization of the premium which he had paid on the acquisition of the bonds. This deduction is squarely within the language of Section 171 of the 1954 Code.[2] He also took a deduction for his contributions to Yale and the T. M. Evans Foundation.
 
 
 3
 The Government feels very badly that the taxpayer thus secured a double deduction. It suffers even more because the taxpayer, being in the highest tax bracket, really made a profit, tax-wise, out of the combined deductions.[3] Mr. Evans frankly admitted that the thing which caused him to set up the transactions the way he did was the possibility of the double deduction and that he had been advised about it through both investment and legal counsel.
 
 
 4
 It is this motivation of tax avoidance which is the basis of the Government's insistence that Mr. Evans is not entitled to the amortization deduction on his bonds. Great point is made of Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, and some of the language in that decision.
 
 
 5
 It is to be noted, however, that there was no pretense about the transaction by which the taxpayer acquired these securities. As the district court pointed out, he had all the rights and obligations of ownership. If the bonds declined he stood to suffer loss.[4] Conversely, he was entitled to the benefit of any advance in market value and to the income from the bonds during the time he held them. He had no commitment to sell the bonds or to give them away. Whatever plan he had was only in his mind. Neither Yale University nor the T. M. Evans Foundation could have forced the gift. In other words, here is a man who had become the full owner, in a straightforward commercial transaction, of a purchase of utility bonds which he was privileged either to keep or to give away. He gave them away. The only basis of attack on the deduction which the plain words of the statute give is the fact that he was motivated by a desire to avoid taxes and got competent advice to accomplish it. If tax avoidance, within the rules, is to take a case out of a deduction provided by statute, we think every legally advised taxpayer is going to find himself in very hot water. The point in this case is that the purchase of these bonds by the taxpayer was a real and not a feigned transaction.
 
 
 6
 At the time this case was argued before us the taxpayer could rely upon the Seventh Circuit's decision in Maysteel Prods., Inc. v. Commissioner, 1961, 287 F.2d 429, and the Sixth Circuit case of Parnell v. United States, D.C.M.D.Tenn. 1958, 187 F.Supp. 576, affirmed per curiam 1959, 272 F.2d 943. In the meantime, however, the First Circuit has decided for the taxpayer in three cases, all of which were handled in the same opinion and all of which support the district court result in this case. See Fabreeka Prods. Co. v. Commissioner; Friedman v. Commissioner; Sherman v. Commissioner.
 
 
 7
 The provision of the 1954 Code contained a limitation on the deduction in the case of bonds issued after January 22, 1951.[5] The Technical Amendments Act of 1958, § 13, 72 Stat. 1610, made a further modification.[6] As Judge Aldrich says in concluding the First Circuit opinion: "Granting the government's proposition that these taxpayers have found a hole in the dike, we believe it one that calls for the application of the Congressional thumb, not the court's."
 
 
 8
 This leaves us with the further difficult point, however, of whether the taxpayer is to have amortization on the basis of the "general" call price of the bonds or the lower "special" call price, which results in a larger deduction. As we understand it, a general call is one which a corporation employs when it finds that the current rate of interest on bonds is substantially less than what it is paying on an outstanding issue. If there is a provision in the bond permitting it to be called, the debtor may call it and refinance his obligations at a lower interest rate. Of course, the general call price must be high enough to compensate the lender for the loss of his now-profitable investment. On the other hand, a special call is one by which, subject to the terms of the original contract, bonds may be called and paid for out of special funds set up by the terms of the indenture and to which the debtor is obligated to make periodic payments. A typical example would be a sinking fund to which the debtor each year makes a stipulated payment. A purchaser, when he buys bonds on the market, does not know whether his bonds will be called at all before maturity or, if they are, whether it will be at the special or the general call price.
 
 
 9
 The district court in this case allowed the taxpayer to amortize the difference between the premium and the special call price, which gave him a larger deduction than if he had been allowed only the general call price. This result has the support of the Sixth Circuit in Parnell v. United States, 1959, 272 F.2d 943, affirming per curiam D.C.M.D.Tenn.1958, 187 F.Supp. 576. It is contrary, however, to the Second Circuit's decision in Estate of Gourielli v. Commissioner, 289 F.2d 69, certiorari granted, Hanover Bank v. Commissioner of Internal Revenue, 82 S.Ct. 53, in which Judge Friendly, in his always thorough and scholarly discussion, comes to a conclusion affirming the Government's insistence that the general call price is the measure of the deduction. The difference between the Sixth and Second Circuits is not one which will shake the foundation of the United States Treasury. Certiorari has been granted in the Second Circuit's case and we shall have, in due course, an authoritative answer to our question. In the meantime, it is the job of a Court of Appeals to decide the cases before it as best it can with the hope that the best it can is good enough.
 
 
 10
 The statute itself is certainly not clear. It leaves the matter completely in the air, providing only that the bond premium "* * * shall be determined * * * with reference to the amount of the basis * * * [and] with reference to the amount payable on maturity or on earlier call date * * *." Since 1953 the Service has ruled both ways on the question. See Letter Ruling of Oct. 16, 1953 (allowing special price); Rev.Rul. 56-398, 1956-2 Cum.Bull. 984 (with minor exceptions, limiting deduction to general price).
 
 
 11
 We think, first of all, that this question should be settled by a general rule applicable to the cases as and when they come up. We think it would be hard on the taxpayer, as well as a difficult problem of administration, to go into the question of whether in any particular case there is a probability of a call of the bonds involved, whether the funds out of which a special call is to be made are sufficient, whether the price of the bonds has dropped low enough so the debtor is buying its own bonds on the market and retiring them in that manner, and so on and so on. We think both Government and taxpayer will be better off with a general rule.
 
 
 12
 With complete deference to the Second Circuit opinion, we are going to take the other view and uphold the district court in its allowance of the deduction based on the special call price. We have testimony from the plaintiff's expert that in the three months prior to the hearing of this case there were seven special calls of public utility bonds and no general calls. There was also testimony, not necessarily convincing in reaching a result, that if there were any calls to be made during 1954 and 1955 they would have been made at the special call price. The taxpayer's expert also testified that the special call price is usually the price at which the offering is first made to the public. An examination of Standard and Poor's Bond Guide for 1954 and 1960 shows that in those years special calls were numerically more frequent than general calls and that a substantial dollar amount of bonds was called specially in both years. It seems to us that these factors are significant in supporting a conclusion that an allowance based on the special price is a fair one and one which the taxpayer would expect to have happen.
 
 
 13
 We are satisfied, therefore, with the special call price sustained by the district court until we are told by the Supreme Court that the other rule is to prevail.
 
 
 14
 The judgment of the district court will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 The taxpayer, T. M. Evans, and his wife, Josephine S. Evans, filed a joint return and so Mrs. Evans is a party to the record. But the controversy here deals solely with transactions in which only Mr. Evans took part. He is, therefore, referred to as "the taxpayer."
 
 
 [2]
 The portions of § 171 applicable to the transactions in question are as follows:
 "§ 171. Amortizable bond premium.
 "(a) General rule. — In the case of any bond, as defined in subsection (d), the following rules shall apply to the amortizable bond premium (determined under subsection (b)) on the bond:
 "(1) Interest wholly or partially taxable. — In the case of a bond (other than a bond the interest on which is excludable from gross income), the amount of the amortizable bond premium for the taxable year shall be allowed as a deduction.
 * * * * *
 "(b) Amortizable bond premium. —
 "(1) Amount of bond premium. — For purposes of paragraph (2), the amount of bond premium, in the case of the holder of any bond, shall be determined —
 "(A) with reference to the amount of the basis (for determining loss on sale or exchange) of such bond,
 "(B) with reference to the amount payable on maturity or on earlier call date (but in the case of bonds described in subsection (c) (1) (B) issued after January 22, 1951, and acquired after January 22, 1954, only if such earlier call date is a date more than 3 years after the date of such issue) * * *.
 * * * * *
 "(2) Amount amortizable. — The amortizable bond premium of the taxable year shall be the amount of the bond premium attributable to such year. * * *"
 
 
 [3]
 As previously stated, Mr. Evans put up $118,000 of his own money. The amortizable bond deduction amounted to $170,500, resulting in a tax saving of $139,414. The gifts of $1,250,000 face amount bonds in 1954 resulted in an additional deduction of more than $87,000, and a gift of the remainder of the bonds in 1955 increased this figure to more than $100,000. Thus, taxpayer's total tax saving was close to $240,000. As the Government plaintively points out in its brief: "[I]ndeed, it would have been cheaper for the Government to have itself donated double the amount of taxpayer's gift directly to the charities."
 
 
 [4]
 This in fact occurred in one of the First Circuit cases which we cite below, Sherman v. Commissioner, 1961, 294 F.2d 876
 
 
 [5]
 The 1954 Code added the provision that the premium on callable bonds may be amortized to the nearest call date only if that date is more than three years from the date of the original issue of the bonds. See note 2 supra. However, this provision did not apply to taxpayer's bonds since they were issued before January 22, 1951
 
 
 [6]
 The 1958 amendment in substance provided that the premium on any taxable bond acquired after December 31, 1957, may not be amortized to any date earlier than the maturity date unless a similar deduction results from amortization to an earlier call date