## HANOVER BANK, EXECUTOR, ET AL. v. COMMISSIONER OF INTERNAL REVENUE.

No. 224.  Argued February 27, 1962.—Decided May 21, 1962.

*Theodore Tannenwald, Jr.* argued the cause for petitioners. With him on the briefs was *David Alter.* *Horace S. Manges* was on the petition.

*Stephen J. Pollak* argued the cause for respondent. With him on the briefs were *Solicitor General Cox, Assistant Attorney General Oberdorfer, Meyer Rothwacks, Douglas A. Kahn* and *Wayne G. Barnett.*

A brief urging reversal was filed by *William Waller,* as *amicus curiae.*

Mr. Chief Justice Warren delivered the opinion of the Court.

Despite the seemingly complex factual composition of the two cases consolidated herein,[1] this opinion deals with a relatively simple question of taxation: The extent to which a taxpayer may deduct, through amortization under the Internal Revenue Code of 1939, the premium he has paid in purchasing corporate bonds. In 1953, prior to December 1, the petitioners purchased fully taxable utility bonds at a premium above maturity value.[2] The bonds were callable at the option of the issuer at either a general or special call price, and at either price they were callable upon 30 days' notice. The term "general call price" is used to designate the price at which the issuer may freely and unconditionally redeem all or any portion of the outstanding bonds from its general funds. The lower, "special call price," is the amount the issuer would pay if the bonds were redeemed with cash from certain specially designated funds.[3]

---

[1] We have before us two cases which originated in the Tax Court: *Estate of Gourielli* v. *Commissioner*, 33 T. C. 357, and *Goldfarb* v. *Commissioner*, 33 T. C. 568. The cases were consolidated on appeal to the Court of Appeals for the Second Circuit, and one opinion was filed by that court. *Estate of Gourielli* v. *Commissioner*, 289 F. 2d 69. Petitioner Hanover Bank is the executor of the estate of Mr. Gourielli, who passed away since the commencement of this action.

[2] The bonds involved in the *Gourielli* case were Appalachian Electric Power Company, 1981 series, bonds, which decedent and his wife purchased for $117.50 per $100 face value, and which were later sold for $115.50. The bonds in *Goldfarb* were Arkansas Power & Light Company, 30-year, Eighth Series, bonds, which petitioners purchased at an average price of $110.50 per $100 face amount, and which were later sold at an average price of $105.40. The total purchases in the two cases were $540,000 (*Gourielli*) and $500,000 (*Goldfarb*) face amount; the purchase prices were paid in cash in both cases.

[3] In addition to a "sinking fund" into which the indenture required Appalachian to deposit during each annual period an amount (in

In computing net income, the 1939 Code permits a taxpayer to deduct, through amortization, the premium he has paid in purchasing corporate bonds.[4] Section 125 of the Code, set forth in pertinent part in the margin,[5] pro-

cash or property additions of an equivalent amount) equal to one percent of the bond issue, the special funds in the case of the Appalachian bonds were: (1) a released property and insurance fund, to which deposits were required only upon a loss by casualty or by a release of mortgaged properties securing the bonds; and (2) a maintenance fund, to which deposits were required only when Appalachian failed to expend a stated percentage of its revenues on maintenance or improvements. The special funds in the case of the Arkansas bonds were made up from the same type contributions as above, plus additions made to an eminent domain fund if and when mortgaged property was taken from the company by eminent domain proceedings.

[4] Internal Revenue Code of 1939 (26 U. S. C., 1952 ed.):

"SEC. 23. DEDUCTIONS FROM GROSS INCOME.

"In computing net income there shall be allowed as deductions:

.        .        .        .        .

"(v) [as added by § 126 (a), Revenue Act of 1942, c. 619, 56 Stat. 798] BOND PREMIUM DEDUCTION.—In the case of a bondholder, the deduction for amortizable bond premium provided in section 125."

[5] This Section was also added by the Revenue Act of 1942, *supra*, note 4, § 126 (b). Entitled "Amortizable Bond Premium," it reads in pertinent part as follows:

"(a) GENERAL RULE.—In the case of any bond, as defined in subsection (d), the following rules shall apply to the amortizable bond premium (determined under subsection (b)) on the bond for any taxable year beginning after December 31, 1941:

.        .        .        .        .

"(b) AMORTIZABLE BOND PREMIUM.—

"(1) AMOUNT OF BOND PREMIUM.—For the purposes of paragraph (2), the amount of bond premium, in the case of the holder of any bond, shall be determined with reference to the amount of the basis (for determining loss on sale or exchange) of such bond, and with reference to the amount payable on maturity or on earlier call date, with adjustments proper to reflect unamortized bond premium with respect to the bond, for the period prior to the date as of which

vides that the amount of bond premium to be amortized "shall be determined . . . with reference to the amount payable on maturity or on earlier call date." Pursuant to this Section, the petitioners elected to claim on their 1953 income tax returns a deduction for bond premium amortization computed with reference to the special redemption price and to the 30-day redemption period appearing in the bond indentures. The respondent did not question the petitioners' use of the 30-day amortization period, but he disallowed the computation based upon the special redemption price and recomputed the amount of bond premium using the higher, general call price.[6] The Court of Appeals for the Second Circuit

_____

subsection (a) becomes applicable with respect to the taxpayer with respect to such bond.

"(2) AMOUNT AMORTIZABLE.—The amortizable bond premium of the taxable year shall be the amount of the bond premium attributable to such year.

"(3) METHOD OF DETERMINATION.—The determinations required under paragraphs (1) and (2) shall be made—

"(A) in accordance with the method of amortizing bond premium regularly employed by the holder of the bond, if such method is reasonable;

"(B) in all other cases, in accordance with regulations prescribing reasonable methods of amortizing bond premium, prescribed by the Commissioner with the approval of the Secretary."

[6] At the time of the deduction in *Gourielli*, the schedule appearing in the Appalachian bond indenture provided that the bonds could be redeemed at a general call price of 105⅜ or a special call price of 102⅜. The petitioners' basis was $117.50 (see *supra*, note 2) and therefore amortization of premium with reference to the two prices would result in a deduction of $64,831.07 or $83,056.07, respectively. The difference in these amounts, $18,225.00, was the amount disallowed by the respondent. By a similar recomputation with reference to the schedule of redemption prices appearing in the Arkansas bond indenture (105.36 as compared to 101.36), the respondent reduced the deduction in *Goldfarb* by $27,175.00. The actual tax deficiency in each case was considerably less ($14,200.92 and $14,708.16, respectively), of course, because disallowance of the larger premium

affirmed the Tax Court's orders sustaining the Commissioner's deficiency determination. 289 F. 2d 69. However, in cases presenting the identical legal issue, the Courts of Appeals for the Third (*Evans* v. *Dudley,* 295 F. 2d 713) and Sixth (*United States* v. *Parnell,* 272 F. 2d 943, affirming 187 F. Supp. 576) Circuits allowed amortization taken with reference to the special redemption prices.[7] To resolve this conflict, we granted certiorari. 368 U. S. 812.

---

resulted in a corresponding increase in the petitioners' basis which had been adjusted pursuant to Section 113 (b)(1)(H) of the Code when the premium was amortized. This increase in basis resulted in a smaller short-term capital gain (the petitioners held the bonds less than six months) than had been reported by petitioners in their 1953 returns. The decrease in tax due on the capital gain was offset against the amount of amortization disallowed to arrive at the petitioners' actual tax deficiencies in issue here.

[7] In addition to the Third and Sixth Circuits' cases, the First and Seventh Circuits have also allowed deductions of bond premium amortization taken with reference to special redemption prices. In the First Circuit: *Fabreeka Products Co.* v. *Commissioner,* 294 F. 2d 876, vacating and remanding 34 T. C. 290; *Sherman* v. *Commissioner,* 34 T. C. 303; and *Friedman* v. *Commissioner,* 34 T. C. 456. In the Seventh Circuit: *Gallun* v. *Commissioner,* 297 F. 2d 455, reversing 1960 P–H T. C. Memo. Dec. ¶ 60,104; and *Maysteel Products, Inc.,* v. *Commissioner,* 287 F. 2d 429, reversing 33 T. C. 1021. In each of these cases the taxpayer had purchased bonds at a premium, amortized that premium to the special call price, and thereafter made a distribution of the bonds which entailed a double tax deduction (*e. g.,* a gift to charity). In each case the Court of Appeals allowed the double deduction. Although the precise issue presented in the instant case was not expressly decided in these latter cases, due to the fact that the Commissioner did not choose to challenge the use of the special call price as against the general call price for determining the amount of the premium, the allowance of the amortization to the special redemption price impliedly places the First and Seventh Circuits in accord with the Third and Sixth Circuits.

Bond premium is the amount a purchaser pays in buying a bond that exceeds the face or call value of the bond.[8] When a bond sells at a premium, it is generally because the interest it bears exceeds the rate of return on similar securities in the current market. For the right to receive this higher interest rate the purchaser of a bond pays a premium price when making the investment. However, interest is taxable to the recipient, and when a premium has been paid the actual interest received is not a true reflection of the bond's yield, but represents in part a return of the premium paid. It was to give effect to this principle that Congress in 1942 enacted Section 125 of the 1939 Code,[9] which for the first time provided for amortization of bond premium for tax purposes.

---

[8] See the authorities collected in *Commissioner* v. *Korell*, 339 U. S. 619, 627, n. 10. The Court in *Korell*, a case also involving an interpretation of Section 125 (see discussion, pp. 682–683, *infra*), concluded (339 U. S., at 627): "We adopt the view that 'bond premium' in § 125 means any extra payment, regardless of the reason therefor . . . ."

[9] *Commissioner* v. *Korell*, 339 U. S. 619, 621. See 1 Hearings before House Committee on Ways and Means on Revenue Revision of 1942, 77th Cong., 2d Sess. 90 (1942). The House Committee noted the recommendation made in the hearings that the difference between yield and the actual interest rate be treated as a return of capital and not as a capital loss (H. R. Rep. No. 2333, 77th Cong., 2d Sess. 47):

"Under existing law, bond premium is treated as a capital loss sustained by the owner of the bond at the time of disposition or maturity and periodical payments on the bond at the nominal or coupon rate are treated in full as interest. The want of statutory recognition of the sound accounting practice of amortizing premium leads to incorrect tax results which in many instances are so serious that provision should be made for their avoidance."

However, in rejecting the Government's argument in *Korell, supra,* that Congress intended to confine the deduction only to premium paid for a higher-than-market interest rate, the Court stated (339 U. S., at 626–627):

"At most, [the Commissioner's] presentation of the legislative materials suggests that Congress may have had the bondholder who was

By providing that amortization could be taken with reference to the "amount payable on maturity or on *earlier call date*" (emphasis added), Congress recognized that bonds are generally subject to redemption by the issuer prior to their maturity. In electing to allow amortization with reference to the period the bonds might actually be outstanding, Congress, through the words to which we have lent emphasis, provided that a bondholder could amortize bond premium with reference to any date named in the indenture at which the bond might be called.[10]

A bond indenture might contain any number of possible call dates, but we need only to be concerned in this case with the issuer's right to call the bonds on 30 days' notice at either a general or special call price. Unquestionably, both general and special redemption provisions have a legitimate, though distinct, business purpose, and both were in widespread use well before the enactment of Section 125. The general call price is employed when the issuer finds that the current rate of interest on marketable securities is substantially lower than what it is paying on

---

seeking a higher interest rate primarily in mind; but it does not establish that Congress in fact legislated with reference to him exclusively. [Citation omitted.] Congress, and the Treasury in advising Congress, may well have concluded that the best manner of affording him relief and correcting the inequitable treatment of bondholders whose interest receipts were taxable, was to define the scope of the amendment by reference to types of bonds rather than causes of premium payment."

[10] Congress' intent in this regard was expressly noted by the respondent in enacting Treas. Reg. 118, § 39.125 (b)–2:

*"Callable and convertible bonds.* (a) The fact that a bond is callable . . . does not, in itself, prevent the application of section 125. . . . The earlier call date may be the earliest call date specified in the bond as a day certain, the earliest interest payment date if the bond is callable at such date, the earliest date at which the bond is callable at par, or such other call date, prior to maturity, specified in the bond as may be selected by the taxpayer. . . ."

an outstanding issue. The issuer may then call the bonds at the general price and, following redemption, may refinance the obligation at the lower, prevailing rate of interest. In contrast, the provision for special funds from which bonds may be redeemed at the special call price, serves an entirely different purpose. Bond indentures normally require the issuer to protect the underlying security of the bonds by maintaining the mortgaged property and by insuring that its value is not impaired. This is done, first, through the maintenance of a special sinking fund, to which the issuer is obligated to make periodic payments, and, secondly, through the maintenance of other special funds, to which are added the proceeds from a sale or destruction of mortgaged property, or from its loss through a taking by eminent domain.[11] Although the issuer normally reserves an alternative to maintaining these special funds with cash, circumstances may dictate that the only attractive option from a business standpoint is the payment of cash and, to prevent the accumulation of this idle money, the indenture provides that the issuer may use it to redeem outstanding bonds at a special call price. It is evident that just as prevailing market conditions may render redemption at the special call price unlikely at a given time, the same or different market conditions may also cause redemption at the general call price equally unlikely,[12] particularly in an expanding

---

[11] See generally *Evans* v. *Dudley,* 295 F. 2d 713, 715; *Estate of Gourielli* v. *Commissioner,* 289 F. 2d 69, 73; *Parnell* v. *United States,* 187 F. Supp. 576, 577, aff'd, 272 F. 2d 943. See also Badger, Investment Principles and Practices (5th ed. 1961), 46–47, 114–115, 129; I Dewing, Financial Policy of Corporations (5th ed. 1953), 186–188, 247–249.

[12] Hence, the occurrence of a redemption at the general call price is dependent upon one set of events—the fluctuation in the interest market; the occurrence of a redemption at the special call price is dependent upon another set of events—deposits in the sinking fund

industry such as utilities. During the period the petitioners held their bonds, none were called at either price, but the risk incurred that they would be called was present with equal force as to both the general and special call provisions. The market for bonds reflects that risk, and the Section of the Code we are asked to interpret takes cognizance of that market reality.

Turning to the specific problem in the instant case, we are asked to determine whether the special price at which the bonds may be redeemed by the issuer from the limited sinking fund account and from the other special funds made available upon the occurrence of certain contingent events (see note 3, *supra*) is an "amount payable . . . on earlier call date" within the meaning of Section 125. For the reasons stated below, we answer this question affirmatively and hold that there is no basis either in the statute, in the legislative history, or in the respondent's own prior interpretations of the statute, for a distinction between reference to a general or special call price in computing amortizable bond premiums under the 1939 Code.

First, we note that the Government has made certain important concessions which lighten considerably the task before us. It does not question the right of the petitioners to amortize bond premium with reference to the 30-day call period, nor does it question amortization to the general call price.[13] In addition, in requesting a rule

---

by the issuer over one or more years, takings by governmental agencies through eminent domain, destruction of the property securing the bonds, etc. In either case, the events could happen. In fact, the petitioners point out in their brief here that in recent years more bonds have been called at the special redemption price than at the general price. See also *Evans* v. *Dudley*, 295 F. 2d 713, 716.

[13] Allowing a 30-day amortization period is in accord with the decision of the Court in *Korell* where, although the point was not argued by the Government, the taxpayer had amortized the premium

which will apply to the "generality of cases," [14] it professes to have abandoned its argument below which became the rationale of the Second Circuit in holding against the taxpayers, that the statute calls for an analysis into the "likelihood of redemption" before amortization at a special call price will be permitted.[15] Moreover, the

with reference to the 30-day period provided in the indenture. In its brief in the instant case the Government states:

". . . [W]e concede that it is now too late to challenge the amortization of the premium on bonds subject to an unlimited right of redemption on 30 days' notice. Not only has the consistent administrative practice, culminating in a published ruling, been to allow such amortization, but Congress, in narrowing such deductions in the 1954 Code and prohibiting them entirely after 1957, expressly acknowledged that the prior law permitted that treatment. . . . Accordingly, we did not challenge in the lower courts and do not challenge here petitioners' right to amortization of the premium on the basis of the general right of the issuer to redeem the bonds at any time upon 30 days' notice."

See also Int. Rev. Rul. 56–398, 1956–2 Cum. Bull. 984, where the respondent, in a published ruling, acquiesced in a 30-day amortization period under the 1939 Code.

[14] This concession also conforms to the pronouncement in *Korell* (339 U. S., at 625): "Congress was legislating for the generality of cases." See also *Evans* v. *Dudley*, 295 F. 2d 713, 716; *Parnell* v. *United States*, 187 F. Supp. 576, 579, aff'd, 272 F. 2d 943.

[15] The Court of Appeals for the Second Circuit stated (289 F. 2d 69, 74): "We do not think that . . . in § 125 of the Code . . . [Congress] meant to include an amount payable on a call at a 'special' price of which there was no real possibility during the period for which the amortization is being taken and the deduction claimed." And (289 F. 2d, at 72): ". . . [T]he hazard that any significant number of petitioners' bonds would be called during [the] period was infinitesimal." In so holding, the Court accepted the Government's argument below that "[t]he taxpayer is not entitled to compute his amortizable bond premium deduction . . . with reference to the 'special' call price . . . because . . . such a call was so contingent and unlikely that there was no realistic call date at the 'special' call price . . . ."

In contrast, the Government states in its brief here: ". . . [O]ur position is not dependent upon the particular market conditions or

Government does not contend that the transactions entered into by the petitioners were a sham without any business purpose except to gain a tax advantage.[16] Rather, the Government's position in this Court is that before an "earlier call date" is established with reference to the special call price, the taxpayer must show that "there is an ascertainable date on which the issuer will become entitled to redeem [a particular] bond at its option." The Government asserts that it is not enough that the issuer has the right to call some bonds at the special redemption price. Rather, "[i]t must have the right to call the particular bond for which amortization is claimed, for otherwise *that* bond has no 'earlier call date.'" The Government's primary reason for urging this interpretation of Section 125 is that the statute has created a tax loophole of major dimension that should be closed short of allowing the deduction sought in this case. While this assertion might have been persuasive in securing enactment of the amendments to the statute made subsequent to the time the transactions involved here took place (see discussion, *infra*), it may not, of course, have any impact upon our interpretation of the statute under review. We are bound by the meaning of the words used by Congress, taken in light of the pertinent legislative history. In neither do we find support for the Government's interpretation.

This Court was first called upon to construe Section 125 in 1950 in *Commissioner* v. *Korell,* 339 U. S. 619. The

---

the actual probabilities that a right of redemption will be exercised. . . . [W]e agree with petitioners that the question . . . should not be dependent upon a finding in each case of the actual 'likelihood' that any particular redemption right will be exercised." As to the futility in attempting to apply a "likelihood of redemption" standard, see note 12, *supra.*

[16] Cf. *Knetsch* v. *United States,* 364 U. S. 361; *Gregory* v. *Helvering,* 293 U. S. 465.

taxpayer there had purchased bonds at a premium which reflected in large part not a higher yield of interest, but, rather, the attractiveness of the convertible feature of the bonds. The bonds were callable on 30 days' notice and the taxpayer amortized the premium accordingly. In contesting the deduction thus taken, the Commissioner contended that Section 125, in establishing a deduction for "amortizable bond premium," did not include premium paid for the conversion privilege. In rejecting this contention, the Court made it clear that Section 125 was not enacted solely to enable a bondholder to amortize "true premium," but that by "the clear and precise avenue of expression actually adopted by the Congress" (339 U. S., at 625), the legislation was adopted with "no distinctions based upon the inducements for paying the premium." (*Id.*, at 628.)

The decision in *Korell* led to congressional re-examination of Section 125, and the enactment of Section 217 (a) of the Revenue Act of 1950 (64 Stat. 906), which eliminated amortization of bond premiums attributable to a conversion feature. However, response to the *Korell* decision was specifically limited to the convertible bond situation; no further change was made in the statute which would reflect on its interpretation in the case before us.[17]

---

[17] The legislation simply provided:

"In no case shall the amount of bond premium of a convertible bond include any amount attributable to the conversion features of the bond."

Where, as in the case before us, a question of interpretation of Section 125 is presented lying outside the scope of the 1950 Amendment, *Korell* retains its full vitality. Thus, it is worth noting that the Government's "right to call" approach advocated in the case at bar would result in a *sub silentio* overruling of *Korell* to the extent that in the latter case the right of the bondholder to exercise his conversion option at any time through the expiration of the notice period of a call defeated completely the issuer's "right" to call and redeem

In 1954, in enacting the successor to Section 125, Section 171 of the Internal Revenue Code of 1954 (26 U. S. C., 1958 ed.), Congress again took cognizance of the tax benefit in question, and determined to eliminate the abuses inherent in permitting amortization with reference to 30-day call periods.   Thus Congress further narrowed the loophole by providing that the premium on callable bonds could be amortized to the nearest call date only if such date was more than three years from the date of the original issue of the securities.   With particular relevance to the Government's argument in the instant case, it is worthy of note that Congress understood the operation of the statute to the taxpayer's advantage, but limited correction of the abuses inherent in it to elimination of the quick write-off.   The House Report accompanying H. R. 8300, which was to become the Internal Revenue Code of 1954, stated (H. R. Rep. No. 1337, 83d Cong., 2d Sess. 26):

> "Under existing law, a bond premium may be amortized with reference to the amount payable on maturity or on earlier call date, at the election of the taxpayer.   In the case of bonds with a very short call feature, such as those providing for call at any time on 30-day notice, the entire premium may be deducted in the year of purchase.
>
> "This provision has given rise to tax-avoidance opportunities.   Substantial bond issues have been made subject to a 30-day call, permitting the purchaser to take an immediate deduction for the entire premium against ordinary income.   *Where the call feature is nominal or inoperative* this permits a

---

even a single bond.   In the instant case, however, neither party disputes the fact that at least some of the bonds could have been called at the special price and that if the issuer exercised his right so to call them the bondholder would have had no choice but to turn over the bonds and forfeit the premium paid for them.

deduction for an unreal loss, since the market value of the bonds ordinarily remains fairly stable over considerable periods. The bonds may then be resold after 6 months subject to long-term capital gain treatment. The writeoff of premium thus affords a gratuitous tax saving, equivalent to the conversion of a corresponding amount of ordinary income into capital gain. This process may be repeated indefinitely.

"To curb this type of abuse, your committee's bill provides that the premium on callable bonds may be amortized to the nearest call date only if such date is more than 3 years from the date of original issue of the securities. *This provision will apply only to bonds issued after January 22, 1951, and acquired after January 22, 1954.*" (Emphasis added.)

Not only did Congress fail to make the distinction between general and special call provisions urged by the respondent, but it expressly recognized that deductions could be taken under Section 125 with reference to a call date that was "nominal or inoperative." It did not remotely imply that a showing of a right to call all or any part of the outstanding bonds was necessary for operation of the statute. Furthermore, the change that it did adopt was to operate prospectively only.

Finally, in 1958, by adoption of Section 13 of the Technical Amendments Act of 1958, 72 Stat. 1610, Congress eliminated entirely the right to amortize to call date, permitting amortization to be taken only over the period to maturity.[18] Again, the legislative change was prospec-

---

[18] The 1958 Amendment literally permits amortization to an earlier call date but only if it results in a *smaller* amortization deduction than would amortization to maturity, which, for all practical purposes, effectively eliminates the privilege of calling to an earlier call date.

tive only and again no distinction was made with respect to general and special call dates or with respect to a right to call all or a part of the outstanding bonds.

Persuasive evidence that we are correct in our interpretation of Section 125, as bolstered by its legislative history and subsequent amendments, may be found in the respondent's own prior construction of the statute. As is true with the language of the statute itself, the respondent's regulations contained not the slightest hint of the distinction urged upon us here. The Commissioner defined "earlier call date" in Treas. Reg. 118, § 39.125 (b)–2 (see note 10, *supra*) as any call date prior to maturity, specified in the bond. The regulations in effect in 1953 give no support to the Government's present contention that the taxpayer must show an unconditional right in the issuer to call the outstanding bonds at a particular redemption price before amortization with reference to that price would be permitted. Furthermore, although the petitioners are not entitled to rely upon unpublished private rulings which were not issued specifically to them,[19] such rulings do reveal the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws. And, because the Commissioner ruled, in letters addressed to taxpayers requesting them, that amortization with reference to a special call price was proper under the statute,[20] we have

---

[19] See, *e. g., Commissioner v. P. G. Lake, Inc.*, 356 U. S. 260, 265–266, n. 5; *Automobile Club v. Commissioner*, 353 U. S. 180; *Helvering v. New York Trust Co.*, 292 U. S. 455, 467–468.

[20] For example, the record in the instant case contains a copy of the following letter to a taxpayer from the respondent's office (we quote the relevant portion):

"Gentlemen:

. . . . .

"The Appalachian Electric Power Company 3¾% bonds, 1981 Series, are callable in whole or in part through May of 1953 at 105⅝. They are also callable for sinking fund through funds derived from

further evidence that our construction of allowable bond premium amortization is compelled by the language of the statute.[21]

A firmly established principle of statutory interpretation is that "the words of statutes—including revenue acts—should be interpreted where possible in their ordinary, everyday senses." *Crane* v. *Commissioner,* 331 U. S. 1, 6.[22] The statute in issue here, in plain and ordinary language, evidences a clear congressional intent to allow amortization with reference to any call date named in the indenture. Under such circumstances we are not at liberty, notwithstanding the apparent tax-saving windfall bestowed upon taxpayers, to add to or alter the words employed to effect a purpose which does not appear on the face of the statute. Moreover, the legislative history, too, is persuasive evidence that the statute, as it appeared

maintenance or sale of property at any time upon thirty days notice through May 31, 1954 at 102⅜. You request to be advised whether the above-mentioned ruling of July 30, 1952, means that such bonds may be amortized down to 102⅜ or whether it means that they can only be amortized down to 105⅝ through May of 1953.

"Upon the basis of the information on file in this office, it is the opinion of this office that a taxpayer electing to amortize the premium on Appalachian Electric Power Company bonds in accordance with section 125 of the Code may use the regular redemption price of 105⅝ or the special redemption price of 102⅜.

"Very truly yours, [etc.] . . ."

[21] In 1956, three years after the deductions in the present case were taken, the Commissioner—reversing the position he had previously and uniformly adhered to in a series of private rulings—for the first time announced that amortization of bond premium under Section 125 of the 1939 Code was to be limited to premium in excess of a general call price and could not include premium in excess of a lower special call price, except where an actual call was made at the latter price. Int. Rev. Rul. 56–398, 1956–2 Cum. Bull. 984.

[22] See also *Commissioner* v. *Korell,* 339 U. S. 619, 627–628; *Lang* v. *Commissioner,* 289 U. S. 109, 111; *Old Colony R. Co.* v. *Commissioner,* 284 U. S. 552, 560.

in 1953 when these deductions were taken, allowed the deduction refused these taxpayers. Simply stated, an informed Congress enacted Section 125 with full realization of the existence and operation of special call provisions, but chose not to make any distinction between them and general redemption rights. Neither did the Commissioner. Nevertheless, the Government now urges this Court to do what the legislative branch of the Government failed to do or elected not to do. This, of course, is not within our province.[23]

*The judgments are reversed.*

MR. JUSTICE FRANKFURTER took no part in the decision of this case.

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

---

[23] We believe the Court of Appeals for the First Circuit was correct when it said in *Fabreeka Products Co.* v. *Commissioner,* 294 F. 2d 876, 879: "Granting the government's proposition that these taxpayers have found a hole in the dike, we believe it one that calls for the application of the Congressional thumb, not the court's." See also *Evans* v. *Dudley,* 295 F. 2d 713, 715, where the Third Circuit quotes this language from Judge Aldrich's opinion in *Fabreeka Products.*