E. NEWBOLD SMITH AND MARGARET DUPONT SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket Nos. 36158-87; 402-88
United States Tax Court
T.C. Memo 1989-318; 1989 Tax Ct. Memo LEXIS 318; 57 T.C.M. (CCH) 826; T.C.M. (RIA) 89318; June 28, 1989
William A. Kelley, Jr., for the petitioners. Kenneth J. Rubin and Joellyn R. Cattell, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: In his notices of deficiency, respondent determined the following income tax deficiencies and addition to tax for petitioners: Docket No. 36158-87
Addition to tax
Year
Deficiency
Section 6661 [1]
1982
$ 10,834
$ 2,709
*321 Docket No. 402-88
Year
Deficiency
1983
$ 11,663
After concessions, [2] the sole issue for decision is whether medical equipment was leased to a tax-exempt hospital or whether it was used to provide services to the hospital. If the equipment was leased to the hospital, petitioners will not be entitled to take investment tax credits with respect to such equipment; however, if the equipment was used to perform services for the hospital, then petitioners are entitled to take investment tax credits with respect to that property. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference. E. Newbold Smith and Margaret Dupont Smith ("petitioners") resided in Paoli, Pennsylvania, at the time their petition was filed. Margaret Dupont Smith is a party solely by reason *322 of her filing joint Federal income tax returns with her husband. E. Newbold Smith (hereinafter, "petitioner" shall refer to E. Newbold Smith) became a limited partner in Compscan Associates ("Compscan"), a limited partnership organized under the laws of Pennsylvania, on May 24, 1982. Petitioner and the two other Compscan partners made the following cash contributions to the partnership: CONTRIBUTIONS
Partner
1982
1983
1984
David S. Foulke
$  6,750
$ 1,000
$ 10,000
E. Newbold Smith
61,283
8,000
10,000
Edward B. Stokes
6,750
1,000
10,000
The limited partnership agreement provided that Foulke, the general partner, had a participation percentage of 10 percent, petitioner had a participation percentage of 80 percent and Stokes had a participation percentage of 10 percent. [3] The partnership was organized to provide diagnostic services on a CAT Scanner ("scanner") to the Southern Chester County Medical Center ("Hospital"), a tax-exempt organization, as well as to other area hospitals. *323 Compscan acquired an Elscint CAT Scanner, Excel 905 in September 1982, for $ 595,591. To finance the acquisition of the scanner, peripheral equipment and leasehold improvements, Compscan borrowed $ 607,500 from Hamilton Bank pursuant to a promissory note. The note, which was signed on July 16, 1982, was nonrecourse as to the partners and pledged the equipment as collateral. The note was guaranteed up to $ 60,000 by the Central Energy Corporation, of which petitioner owned 88.89 percent of the stock. [4] Compscan entered into an agreement with the Hospital concerning the scanner on May 3, 1982, in which Compscan (referred to in the agreements as "Operator") agreed to perform diagnostic procedures on the scanner for the Hospital and to provide medical interpretations of the data from such procedures. The agreement provided that Compscan's duties under the contract included: (1) Purchasing and maintaining the Equipment; (2) Providing the services of a trained technician to operate the Equipment; (3) Providing the services of a qualified physician on duty or on call, to interpret the results of Procedures performed on the Equipment; (4) Operating the Equipment whenever requested *324 by the Hospital staff, other than during emergencies or periods of routine repair, maintenance or adjustment; (5) Providing periodic inservices for the Hospital medical staff regarding the capabilities of the Equipment; (6) Providing Equipment enhancement, by adding optional hardware and software as provided in Paragraph 6. The Hospital agreed to compensate Compscan for its provision of diagnostic services with the scanner as follows: 3. Compensation. Operator's compensation shall be in the form of payment for Procedures performed for Hospital, with monthly minimums as set forth below. Operator shall reserve for Hospital, and Hospital shall pay Operator for the number of Procedures per month set forth in the following table, at the Procedure Price stated: Years
1st
2nd
3rd
4th
5th
6th
Procedures
per month:
72
80
88
98
98
98
Price per
procedure:
$ 330
$ 365
$ 400
$ 400
$ 400
$ 400
*325 Hospital shall pay for the number of Procedures specified, month by month, whether or not Hospital actually uses the minimum number of Procedures specified for any particular month; however, the Hospital shall be given credit for any it pays for and does not use, as follows. The credit shall be in the full amount paid and it shall be applied against payments due for Procedures in excess of minimums in subsequent months. Any credit not so applied prior to the termination of this Agreement shall be released and extinguished. The agreement provided that Compscan could provide diagnostic scanner services to other hospitals and clinics, so long as those arrangements were not scheduled in such a way as to interfere with prompt service to the Hospital. The scanner agreement entitled the Hospital to require Compscan to provide as much as $ 75,000 for additional peripheral equipment and associated software that might be used in conjunction with the scanner. Paragraph 7 of the agreement also required Compscan to provide the services of one technician and one physician to generate and interpret data from the scanner. The agreement required Compscan to provide services from 8:30 A.M. to *326 4:30 P.M. on weekdays. Service on weekends, holidays and after regular hours was to be performed by Compscan on an ad hoc basis, with compensation for services payable by the Hospital on a reasonable basis agreeable to Compscan and the Hospital. Paragraph 11 of the scanner agreement provided that, in the event of premature termination of the agreement, the Hospital had the right to purchase the scanner and Compscan's leasehold improvements in accordance with the following schedule: Lease Year of Termination
1st
2nd
3rd
4th
5th
6th
Price
$ 700,000
$ 600,000
$ 500,000
$ 400,000
$ 300,000
$ 200,000
The scanner was installed at the Southern Chester County Medical Building, which is adjacent to the Hospital. Compscan leased this space from Southern Chester County Medical Building Associates in June 1982. Compscan retained Joseph Smith, M.D. on May 10, 1982, to interpret scanner tests performed for the Hospital. Compscan also retained an employee to prepare patients for scanning, manipulate the scanner's moving parts, keep supplies available, maintain patient records and document machine usage. The scanner was finally placed in *327 service on December 13, 1982. Compscan initially anticipated demand for their scanner services from other area hospitals; however, it soon became apparent that demand for Compscan's scanner services by medical entities other than the Hospital would be substantially less than originally anticipated. This was due in part to the purchase of scanners by other area hospitals. Compscan then acquired an Apex 410 Digital Gamma Camera ("camera") in December 1982, for $ 110,000. To finance the purchase of the camera, a second business loan agreement was executed with Hamilton Bank on December 28, 1982, in the amount of $ 100,000, which was made on a nonrecourse basis to the partners. The camera was placed in service in January 1983. [5] The Hospital was responsible for retaining the services of physicians and technicians to operate and interpret camera results and to secure and pay for all supplies and utility fees incurred in the operation of the camera. The initial term of the arrangement was four years and the Hospital could exercise a two-year option at the end of the initial term. The Hospital agreed to pay $ 1,300 per month to Compscan for use of the camera. Compscan also agreed *328 to maintain the camera pursuant to a service contract with the manufacturer. Compscan retained the right to enter into arrangements with other hospitals concerning use of the camera. [6]
*329 Compscan acquired a Model #126 Xeroxography System ("xeroxographic equipment") in December 1983, for $ 50,900. The xeroxographic equipment was placed in service in December 1983, pursuant to an agreement entered into by Compscan and the Hospital on December 23, 1983. The agreement required the Hospital to supply the services of physicians and technicians to operate the equipment, to provide any consumable items used in the operation of the equipment and to provide utility services required to run the equipment. The initial term of the agreement was four years, after which the Hospital could extend the agreement for two additional years. The Hospital agreed to pay $ 1,300 per month to Compscan for the use of the equipment. Compscan provided that the xeroxographic equipment would be maintained by the manufacturer pursuant to a service contract during the initial four-year term of the agreement. The agreement allowed Compscan to enter into arrangements with other hospitals and clinics to provide xeroxographic equipment services; however, there is no evidence that Compscan ever entered into any such agreements. The agreement could not be terminated by either party during the initial *330 four-year term except in the case of intentional breach, and termination was possible only if such action was authorized as an appropriate remedy by an arbitrator. Compscan reported that petitioner had an allocable share of qualified investment in section 38 property of $ 589,097 for tax year 1982. In tax year 1983, Compscan reported that petitioner had an allocable share of qualified investment credit of $ 50,900. In their income tax returns for 1982 and 1983, petitioners claimed investment tax credits accordingly. OPINION Respondent claims that Compscan leased the scanner, camera and xeroxographic equipment to the Hospital and that property leased to a tax-exempt organization does not qualify for investment tax credit under section 48(a)(4). Respondent also claims that Compscan, as a noncorporate lessor, was not entitled to investment tax credit under section 46(e)(3). Petitioners maintain that the equipment was not leased to the Hospital; rather, they contend that Compscan used the equipment to provide services to the Hospital and that the equipment is eligible for the investment tax credit. The investment tax credit provisions allow a credit against income tax liability *331 if a taxpayer places certain types of property into business use. Sec. 38. The types of property that are eligible for the credit, known as section 38 property, are set forth in section 48. Specifically, section 48(a)(4) provides that property used by a tax-exempt organization does not qualify for the investment tax credit, unless the property is used predominantly in an unrelated trade or business which has income subject to tax pursuant to section 511. The term "property used by an organization" is defined in the regulations as property owned by or leased to a tax-exempt organization. Sec. 1.48-1(j), Income Tax Regs. The regulation also provides an example: "Thus, for example, a data processing or copying machine which is leased to an organization exempt from tax would be considered as property used by such organization." The parties agree that Compscan's medical equipment was not used by the Hospital in an unrelated trade or business. Section 46(e)(3) provides that noncorporate lessors are not entitled to investment tax credit unless they manufactured or produced the property or unless the term of the lease meets certain specific conditions. Therefore, the sole question *332 for decision is whether Compscan's medical devices were leased to the Hospital, or whether Compscan used the devices to provide diagnostic services to the Hospital. Petitioners must prove that they are entitled to the investment tax credits disallowed by respondent. Rule 142(a). The Internal Revenue Service has ruled that investment tax credits may be taken if the taxpayer "provides services" to a tax-exempt organization, as opposed to merely letting such an organization "use" the property. The genesis of this doctrine can be found in Rev. Rul. 68-109, 1968-1 C.B. 10, in which a taxpayer installed telephone switchboard systems on the property of tax-exempt organizations and governmental units. [7] The Service found that the agreement entered into between the taxpayer and the tax-exempt or governmental customers was a service contract, not a sale or a lease. The Service concluded that the equipment qualified as section 38 property because it was not "used by" the tax-exempt organizations. *333 The Service has subsequently issued additional revenue rulings and private letter rulings [8] concerning the distinction between leases and service contracts. Although the Service analyzed a wide variety of transactions involving many different types of equipment, the following factors are most often used by the Service to make this determination: (1) whether the taxpayer retains possession and control over the property (Rev. Rul. 68-109, supra;Rev. Rul. 71-397, 1971-2 C.B. 63); (2) whether the taxpayer retained the ability to move machines in, or remove machines from, the tax-exempt organization (Rev. Rul. 70-313, 1970-1 C.B. 9); (3) whether payment to the taxpayer from the tax-exempt organization was conditioned merely upon the passage of time or, instead, was based on the quantity or quality of the actual services received by the tax-exempt organization (Rev. Rul. 71-397, supra;); (4) whether the equipment was incidental to a broader, integrated performance of services (Rev. Rul. 68-109, supra;Private Letter Ruling 7847075, August 28, 1978); (5) whether the placement of equipment with a *334 tax-exempt organization merely allows the organization to perform services for itself (Rev. Rul. 71-397, supra;Rev. Rul. 72-407, 1972-2 C.B. 10); (6) whether the taxpayer inspects, installs, repairs, updates or maintains such equipment (Rev. Rul. 71-397, supra;Private Letter Ruling 7829066, April 21, 1978); and (7) whether the taxpayer bears risk of loss during the service period (Rev. Rul. 68-109, supra;Private Letter Ruling 7847075, supra). The former Court of Claims was presented with the question of whether a manufacturer of copying machines was providing copying services to various tax-exempt and governmental organizations or whether it was leasing its copiers to the organizations. In Xerox Corp. v. United States,656 F.2d 659 (Ct. Cl. 1981), *335 the Federal government obtained machines from Xerox pursuant to a master agreement between Xerox and the General Services Administration. The master contract permitted the Federal government to cancel the arrangement upon proper notice to the manufacturer. Xerox also entered into similar contracts with state and local governments, tax-exempt organizations and commercial customers. Xerox was responsible for the maintenance and repair of the machines, as well as incorporating changes and improvements. Xerox generally absorbed the cost of delivering the machine to the customers' premises, but the customers usually paid the wiring expenses upon delivery. After analyzing several revenue rulings and private letter rulings, [9] the Court of Claims stated that, "The published and private letter rulings discussed above do not articulate any single test which one could utilize to determine whether a given agreement is a service arrangement or a lease for investment credit eligibility purposes" and that "It is apparent that any such determination must be made on an ad hoc basis." Xerox Corp. v. United States,656 F.2d at 674. *336 The Court of Claims then distilled two major factors from the Service's rulings with which to distinguish service contracts from leases. The first major factor was the nature of the possessory interest in the property retained by the taxpayer, which the Service has measured by examining the following criteria in its rulings: (1) retention of property ownership by the taxpayer; (2) retention of possession and control of the property by the taxpayer; (3) retention of risk of loss by the taxpayer; and (4) reservation of the right to remove the property and to replace it with comparable property. The second major factor was the degree to which the property is part of an integrated operation. The Court of Claims held that Xerox was providing a service, in that Xerox retained ownership as well as a possessory interest in the machines that it placed with its customers. Xerox was responsible for risk of machine loss or damage and was economically at risk because customers could exercise a 15-day cancellation provision. Furthermore, the agreements provided that the customers were prohibited from altering the machines and needed Xerox's permission to move them. Xerox trained customer *337 personnel to operate the machines. Xerox installed new parts, known as retrofits, to improve performance of the machines. Xerox also retained the right to exchange machines at the customers' offices, which illustrates the possession and control that it retained over its machines. The Court of Claims concluded that Xerox used the machines to provide a copying service, which was an integrated package of equipment and services designed to produce copies as its end result. The Service contended that Xerox's customers contracted only for machines which they could operate themselves to make copies used in their work. The court held that Xerox's activities of repair, maintenance, replacement and retrofitting indicated that they were providing an integrated operation, designed to produce copies. The distinction between a lease and a service contract was addressed by Congress in the passage of section 31(e) of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 518, which added new subsection (e) to section 7701, and provides: (1) IN GENERAL. - A contract which purports to be a service contract shall be treated as a lease of property if such contract is properly treated as a lease *338 of property, taking into account all relevant factors including whether or not- (A) the service recipient is in physical possession of the property, (B) the service recipient controls the property, (C) the service recipient has a significant economic or possessory interest in the property, (D) the service provider does not bear any risk of substantially diminished receipts or substantially increased expenditures if there is nonperformance under the contract, (E) the service provider does not use the property concurrently to provide significant services to entities unrelated to the service recipient, and (F) the total contract price does not substantially exceed the rental value of the property for the contract period. This section applies to property placed in service after May 23, 1983, if the lease to the tax-exempt entity was entered into after that date. The xeroxography equipment was placed in service in December 1983, pursuant to an agreement dated December 23, 1983. The scanner and camera were placed in service prior to May 23, 1983, pursuant to agreements that were entered into before that date. Therefore, we must employ pre-section 7701(e) law to determine *339 whether the agreements concerning the use of the scanner and camera were service contracts or were equipment leases. Then we must decide, on the basis of section 7701(e), whether the agreement concerning the xeroxographic equipment was a service contract or a lease. I. Pre-Section 7701(e) The Service's rulings in this area represent an attempt to develop a meaningful test to determine whether an agreement is a service contract or a lease. In the absence of congressional guidance until the introduction of section 7701(e), these rulings provided the following factors which allowed taxpayers to meaningfully distinguish a lease from a service contract: (1) which party has the use and possession or control of the equipment; (2) which party operates the machine; (3) whether the tax-exempt organization pays for the use of the machine for some duration or, instead, pays based upon the number of procedures executed; and (4) whether the equipment is part of a broader, integrated system of equipment and services. Scanner Respondent essentially makes a substance-over-form argument concerning the arrangements Compscan made with respect to the scanner. He claims that Compscan's lease of *340 space to house the scanner nearby in an adjacent building was no different than housing the scanner in the Hospital because Compscan was planning to service the Hospital alone. Respondent also claims that the Hospital already had personnel capable of operating and interpreting the data from the scanner; thus, Compscan's retention of a technician and physician were unnecessary and were done solely to enable Compscan to take investment tax credit on the scanner. With respect to the Hospital's obligation to purchase a minimum number of scanner services per month, respondent claims that this is equivalent to a lease term; in other words, that the mode of payment was, in effect, a lease based on the passage of time, since the Hospital rarely performed more than the minimum number of procedures that it was obligated to purchase each month. Finally, respondent claims that the scanner was not part of a broader, integrated system of equipment and services, such as the switchboard system in Rev. Rul. 68-109, supra, because the scanner was used alone by the Hospital to provide services to itself. We disagree with respondent and find that Compscan entered into a service contract *341 with the Hospital and that petitioners are entitled to take investment tax credit for the scanner. Compscan retained possession and control of the scanner by keeping it in an office adjacent to the Hospital in which it could effectively render services to the Hospital, as well as to patients of other hospitals and clinics. Control of the scanner was further illustrated by Compscan's contractual retention of a technician and physician who were responsible for the use, operation and maintenance of the scanner. With regard to respondent's claim that the Hospital's payment for a certain minimum number of procedures was, in effect, a lease, we observe that the Hospital was allowed to accumulate unused credits for procedures that were not performed each month. The Hospital exceeded the minimum procedures per month on occasion. We decline to recharacterize the per-procedure billing arrangement as a lease. It is doubtful that the Hospital would have contractually obligated itself to pay for a minimum number of procedures per month that was much greater that the number of procedures that they anticipated would be performed, simply because the Hospital would have encountered difficulty in *342 passing on the costs to its patients. Finally, respondent claims that the scanner was not part of a broad and integrated system of services and, therefore, was used by the Hospital to provide services to itself. It is apparent that neither the scanner nor the camera were components of an integrated system of equipment and services, such as the switchboard installed on the premises of tax-exempt and governmental organizations and operated by the employees of such organizations. Rev. Rul. 68-109, supra. The scanner as well as the camera functioned independently to provide diagnostic services and neither machine was but part of some larger process or operation. Based on an application of the above factors, we find that Compscan's agreement with the Hospital concerning the scanner constituted a service agreement, not a lease. Petitioners are entitled to take investment tax credits for the scanner to the extent that they were at risk. [10]
Camera The camera was placed on hospital premises, prompting us to agree with respondent that the Hospital *343 was in possession and control of the camera. Furthermore, the agreement required that the camera was to be operated by employees and contractors of the Hospital -- not of Compscan -- who were responsible for operating and interpreting the results of the camera. The Hospital paid for the use of the camera on a monthly basis, not on a per-procedure basis. This suggests that Compscan leased the camera to the Hospital. The camera did not constitute part of an integrated operation of services because the machine stood by itself in the Hospital and was not interconnected with a broad, integrated system designed to provide services. On the basis of the above four factors, we conclude that the camera does not qualify as section 38 property because it was "used by" a tax-exempt organization. Petitioners are not entitled to any investment tax credit with respect to the camera. II. Section 7701(e) Xeroxographic Equipment Petitioners do not address the application of section 7701(e) to the instant situation and, instead, rely on the Service's rulings and Xerox Corp. v. United States, supra, to persuade us that the equipment was not leased to the Hospital. However, *344 it is clear that the status of the agreement concerning the xeroxographic equipment is governed by section 7701(e). The first factor is whether the Hospital retained physical possession of the xeroxographic equipment. Sec. 7701(e)(1)(A). Compscan's agreement with the Hospital concerning the equipment provided that it was to be kept on the Hospital premises. The Hospital was also responsible for retaining physicians and technicians to operate the xeroxographic equipment, which means that the Hospital controlled the equipment. Sec. 7701(e)(1)(B). Application of these two factors to the xeroxographic equipment agreement suggests that it was a lease. The third factor tending to show that an agreement should be treated as a lease, instead of a service contract, is whether the service recipient had a significant economic or possessory interest in the property. Sec. 7701(e)(1)(C). The initial term of the agreement concerning the xeroxographic equipment was for four years, which constitutes a significant portion of the equipment's useful life. The agreement also permitted the Hospital to purchase the xeroxographic equipment at a prearranged price, based on the number of years it *345 had been used. We find that this agreement was of sufficient length as to give the Hospital a significant economic interest in the xeroxographic equipment. Compscan did not bear any risk of diminished receipts or substantially increased expenditures attributable to nonperformance of service or the xeroxographic equipment. Sec. 7701(e)(1)(D). Facts that establish that Compscan was not under economic risk if it failed to provide services or if the machine failed to operate indicate that the agreement was a lease. Since Compscan did not operate the xeroxographic equipment itself, there was no risk of nonperformance by Compscan itself. Furthermore, paragraph 7 of the agreement provided that as long as the manufacturer (or other service agent) met "the requirements of its service contract, there would be no reductions in the compensation specified in Paragraph 3 on account of occasional down time for routine repair, maintenance or adjustment." Thus, Compscan bore little risk of diminished receipts or substantially increased expenditures, even in the face of machine malfunction. Compscan did not use the xeroxographic equipment to provide concurrent services to other health care entities *346 unrelated to the Hospital, which indicates that the xeroxographic equipment agreement was a lease, not a service agreement. Sec. 7701(e)(1)(E). Although paragraph 5 of the Agreement contemplated the possibility that other hospitals and clinics might use the xeroxographic equipment, such outside usage was conditioned on permission by the Hospital and was permissible as long as the rendering of outside services did not interfere with the Hospital's use of the equipment. Petitioners have failed to show that other hospitals and clinics used or even knew that Compscan had placed xeroxographic equipment at the Hospital; thus, we conclude that this factor also suggests that the agreement was a lease. Finally, section 7701(e)(1)(F) states that an agreement should be treated as a lease if the total contract price set forth in the agreement does not substantially exceed the rental value of the xeroxographic equipment itself during the contract period. Petitioners did not present any evidence concerning the rental value of the xeroxographic equipment. We are unable to see where Compscan performed any services with respect to the equipment, leading us to conclude that the monthly charge *347 of $ 1,300.00 for the xeroxographic equipment constituted its approximate rental value. After evaluating the agreement between the Hospital and Compscan concerning the use of the xeroxographic equipment, we conclude that the agreement was a lease, not a service contract. Sec. 7701(e)(1). Therefore, such equipment does not constitute property eligible for investment tax credit. Sec. 48(a)(4). Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Respondent conceded on brief that petitioners are liable neither for the sec. 6661 addition to tax, nor for the increased interest rate attributable to tax-motivated transactions under sec. 6621(c) for tax year 1982, which respondent raised subsequent to his statutory notice of deficiency.↩
3. Paragraph 8(a) of the limited partnership agreement defined "Participation Percentage" as each partner's distributive share of the partnership's income, profits, gains, losses, deductions and credits.↩
4. Before trial, petitioners argued that this guarantee constituted additional property that was "at risk"; however, petitioners stated at trial that they no longer intended to address this issue. Therefore, we conclude that petitioners have abandoned this issue.↩
5. Petitioners were unable to produce the written agreement between Compscan and the Hospital concerning the camera; however, both parties have agreed that camera operation was governed by an agreement virtually identical to the agreement governing the xeroxographic equipment. We will apply all the material terms of the xeroxographic equipment agreement to the camera. ↩
6. Compscan entered into an agreement with Dr. Smith on December 30, 1982, in which Compscan retained Smith to perform diagnostic procedures on the camera. However, the agreement concerning the xeroxographic equipment, which governs the operation of the camera (pursuant to agreement of both parties at trial), states that the Hospital is responsible for supplying the services of physicians and technicians. Since petitioners have not discussed Compscan's contract with Dr. Smith, or whether he actually performed any diagnostic services on the camera for Compscan, we will assume that physicians and technicians supplied by the Hospital operated and interpreted the results of the camera.↩
7. Although revenue rulings are issued by the Commissioner alone and represent the views of one of the parties before the Tax Court, Browne v. Commissioner,73 T.C. 723, 731 (1980), and are not binding on the Secretary of the Treasury or the courts, they nevertheless may be helpful in interpreting a statute. Stubbs, Overbeck & Associates v. United States,445 F.2d 1142, 1146-1147↩ (5th Cir. 1971).
8. Private letter rulings can be relied upon only by the taxpayer to whom the ruling is addressed; however, such rulings reveal the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws. Hanover Bank v. Commissioner,369 U.S. 672, 686↩ (1962).
9. The Court of Claims examined Rev. Rul. 68-109, 1968-1 C.B. 10, Rev. Rul. 70-313, 1970-1 C.B. 9, Rev. Rul. 71-397, 1971-2 C.B. 63 and Rev. Rul. 72-407, 1972-2 C.B. 10, as well as Private Letter Rulings 7829066↩, April 21, 1978, 7847075, April 28, 1978, and 7913003, November 28, 1978.
10. Petitioners conceded at trial that they were only at risk to the extent of their cash contributions to Compscan.↩