**McDONNELL AIRCRAFT CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 59 C 382(3).

United States District Court
E. D. Missouri, E. D.
May 2, 1963.

William H. Charles, St. Louis, Mo., for plaintiff.

Richard D. FitzGibbon, Jr., U. S. Atty., John A. Newton, Asst. U. S. Atty., St. Louis, Mo., and Mildred L. Seidman, Dept. of Justice, Washington, D. C., for defendant.

REGAN, District Judge.

This suit was filed to recover from the United States of America the sum of $502,009.29,[1] plus interest, which amount represents excess profits taxes and deficiency interest assessed by defendant and paid by plaintiff for taxable years ending June 30, 1952, 1953, and 1954. Jurisdiction is established under 28 U.S. C. § 1346.

The cause was submitted to the Court on the pleadings and a full stipulation of the facts. The plaintiff objected to admission of certain of the stipulated facts, hereinafter noted, on the grounds of irrelevancy, immateriality and incompetency.

A summary of the facts is as follows:

Plaintiff (hereinafter called McDonnell) is a Maryland corporation with its principal place of business in St. Louis County, Missouri. McDonnell was in the business of manufacturing and selling airframes and air craft. Ninety per cent (90%) of its income during the years in question was derived from Government contracts.

For all accounting purposes, taxpayer used the accrual method of accounting with its fiscal or taxable year ending June 30. On its tax returns for all years prior to 1951, McDonnell used the completed contract method of accounting in reporting its net income from long-term contracts. During 1951, McDonnell was given permission by the Commissioner of Internal Revenue to change to the percentage of completion method of accounting for income from long-term contracts on the condition that all income on contracts uncompleted as of June 30, 1950, be reported on McDonnell's return for 1951. Consequently, reported income for normal tax was over $10,000,000.00 of which over $4,000,000.00 represented the percentage of completion of contracts in 1951, and over $6,000,000.00 represented income on contracts uncompleted at June 30, 1950, on which work was performed during 1949 and 1950.

During 1951 through 1954, the Korean War excess profits tax was in effect. 26 U.S.C. § 430 et seq. (All statutory references are to the 1939 Internal Revenue Code unless otherwise specified.) The general purpose of the excess profits tax law was to additionally tax profits resulting from war prosperity. Therefore, a taxpayer was allowed a credit against profits for excess profits tax purposes which credit was intended to reflect normal peacetime profits. Several methods were provided for determining the credit. McDonnell qualified for and chose the growth method. The result of this choice was to compute its excess profits credit by averaging income for the base years, 1949 and 1950.

---

1. Taxes and deficiency interest paid were as follows:

| Year ended June 30 | Assessed Tax | Deficiency Interest | Total |
|---|---|---|---|
| 1952 | $119,182.51 | | $119,182.51 |
| 1953 | $191,909.85 | | $191,909.85 |
| 1953 | $ 98,856.74 | $25,468.47 | $124,325.21 |
| 1954 | $ 55,602.91 | $10,988.81 | $ 66,591.72 |
| | | | $502,009.29 |

Section 455(b) [2] of the excess profits tax law provided that taxpayers computing income from long-term contracts could make an irrevocable election to compute such income for the base period years and the taxable years for excess profits tax purposes as if they had consistently used the percentage of completion method. McDonnell made the election pursuant to Section 455(b) in 1951. Thus, for excess profits tax purposes, the $6,000,000.00 which represented income on contracts uncompleted at June 30, 1950, was attributed to the years 1949 and 1950. As a result, McDonnell's excess profits credit based upon the average net income for the base years, 1949 and 1950, was greater than it would have been had McDonnell used the same accounting method for excess profits net income as for normal tax net income.

During fiscal years 1949 and 1950 and the first six months of fiscal year 1951, McDonnell was subject to renegotiation under the 1948 Renegotiation Act. The second half of 1951 was subject to the Renegotiation Act of 1951. By agreement pursuant to the provisions of the 1951 Act, McDonnell submitted to the Renegotiation Board a consolidated report for the entire fiscal year 1951 as subject to the Renegotiation Act of 1951.

For renegotiation purposes, McDonnell used the same accounting methods as for normal tax purposes. Thus, for the years 1949 and 1950, the reports for renegotiation reflected income from long-term contracts on the completed contract basis and clearance was received for those years. The income reported on the long-term contracts for 1951 consisted of profits based on the percentage of completion of contracts in the year 1951, and profits from work performed in 1949 and 1950 on contracts which were uncompleted at June 30, 1950.

At the conclusion of the renegotiation proceedings, renegotiable net sales for fiscal year 1951 were established at $91,603,286.00 and renegotiable profits were established at $10,089,411.00. On September 12, 1955, an agreement was entered into between McDonnell and the Renegotiation Board which determined that $1,450,000.00 were excessive profits and were repayable to the Government.

The question before this Court is: How should the excessive profits determined upon renegotiation be treated in computing excess profits tax liability for the years 1951–1954?

The parties agree that Section 3806 (a) is controlling. It provides as follows:

"§ 3806. *Mitigation of effect of renegotiation of war contracts or disallowance of reimbursement*

"(a) *Reduction for prior taxable year*

"(1) *Excessive profits eliminated for prior taxable year*. In the case of a contract with the United States or any agency thereof, or any subcontract thereunder, which is made by the taxpayer, if a renegotiation is made in respect of such contract or subcontract and an amount of excessive profits received or accrued under such contract or subcontract for a taxable year (hereinafter referred to as "prior taxable year") is eliminated and, in a taxable year ending after December 31, 1941, the

2. "§ 455. *Relief for instalment basis taxpayers and taxpayers with income from long-term contracts.* * * *

"(b) *Income from long-term contracts.* Any taxpayer computing income from contracts the performance of which requires more than 12 months may elect, in its return for the taxable year, for the purposes of the tax imposed by this subchapter, to compute, in accordance with regulations prescribed by the Secretary, such income upon the percentage of completion method of accounting. Such election

shall be made in accordance with such regulations and shall be irrevocable when once made, and shall also apply to all subsequent taxable years to which this subchapter is applicable. The net income of the taxpayer for each year to which this subchapter is applicable prior to the year with respect to which the election is made shall be adjusted for the purposes of this subchapter. Income described in this section shall not be considered abnormal income under section 456."

taxpayer is required to pay or repay to the United States or any agency thereof the amount of excessive profits eliminated or the amount of excessive profits eliminated is applied as an offset against other amounts due the taxpayer, the part of the contract or subcontract price which was received or was accrued for the prior taxable year shall be reduced by the amount of excessive profits eliminated. * * * "

It is McDonnell's position that Section 3806 is an exception to the rule stated in United States v. Lewis, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560, and Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383, that a tax accounting period cannot be affected by subsequent events. As a statutory exception, it must be strictly construed. McDonnell contends that because the renegotiation is, and can be, for only one year, and because Section 3806 speaks of reduction of excess profits for the "prior taxable year", using "year" in the singular, the renegotiation can affect only the year renegotiated, 1951, for all tax computations. Based upon that position, McDonnell computes its excess profits tax liability subsequent to renegotiation by deducting the entire amount of excessive profits from its excess profits net income for 1951, thereby decreasing income, to which McDonnell applied the excess profits credit computed before renegotiation, and increasing the unused excess profits credit carry-over for the subsequent years which are involved in this action.[3]

On the other hand, it is the Government's position that Section 3806 requires reduction of excessive profits from the years in which they accrued according to the accounting method used to compute the particular tax. It is the Government's position that part of the profits renegotiated and determined to be

3. Before Renegotiation and as adjusted by Revenue Agent June 14, 1954 and December 20, 1955.

| Year | Normal Tax Net Income | Excess Profits Net Income | Excess Profits Credit | Adjusted Excess Profits Net Income |
|---|---|---|---|---|
| 1951 | $11,079,127.79 | $4,373,761.20 | $4,185,479.46 | $ 188,281.74 |
| 1952 | $ 5,307,216.56 | $5,646,164.72 | $5,248,889.70 | $ 397,275.02 |
| 1953 | $ 8,383,330.53 | $8,871,351.97 | $6,158,473.20 | $2,712,878.77 |
| 1954 | $ 7,699,498.05 | $7,885,749.23 | $6,327,210.00 | $1,558,539.23 |

After Renegotiation As Computed By Taxpayer

| Year | Excess Profits Net Income | Excess Profits Credit | Adjusted Excess Profits Net Income | Unused Excess Profits Credit |
|---|---|---|---|---|
| 1951 | $ 2,996,261.20 | $4,185,479.46 | | $1,189,218.26 |
| 1952 | $ 5,646,164.72 | $5,248,889.70 (less adjustment 12% of $693,940.14 decrease equity capital plus unused credit equal $6,-354,835.15) | | $ 708,670.43 |
| 1953 | $ 8,871,351.97 | $6,158,473.20 (less adjustment for equity capital plus unused credit equal $6,-798,172.71) | $2,073,179.26 | |
| 1954 | $ 7,885,749.23 | $6,327,210.00 | $1,558,539.23 | |

excessive, were accrued for excess profits tax purposes in 1949 and 1950. Therefore, that part of the excessive profits must be allocated to the years 1949 and 1950 and excluded from income in those years in computing the excess profits credit. The Government's computations, therefore, first allocate $657,865.00 or 45.37%, of the $1,450,000.00 excessive profits to the base years and allocate $792,135.00 to the year 1951, thus decreasing the average base period net income and decreasing the excess profits credit to be applied against excess profits net income in the taxable years 1951–1954.[4]

The issue presented to the Court is two-fold: (1) Is a portion of the excessive profits determined upon renegotiation attributable to the years 1949 and 1950, and (2), if so, does Section 3806 require that that portion of the excessive profits be allocated to 1949 and 1950 for purposes of computing the excess profits credit?

In answer to the first question, it is necessary to examine what was renegotiated. The Renegotiation Act required the individual contracts to contain a proviso that they were subject to renegotiation. It further provided that the income, costs and profits from such contracts were reportable for renegotiation in accordance with the method of accounting regularly employed by the contractor. 50 U.S.C. Appendix 1952 ed.

§ 1211 et seq. The regulations required that the contractor use, absent special agreement, the same accounting method as was used for income tax purposes. 32 C.F.R. (1954 Ed.) Section 1423.380–1423.389; 1459.1–1459.10. Pursuant to these provisions of the Act and regulations, the profits accruing on government contracts for income tax purposes for 1951, including those bunched into the year 1951 because of the accounting change, were reported for renegotiation.

McDonnell does not contend that the "bunched" income was not reportable, or renegotiable, in 1951 or that it was not considered by the Renegotiation Board. Rather, McDonnell contends that none of the excessive profits finally taxed by the renegotiation agreement can be attributed to years other than 1951 because such an allocation by the Commissioner of Internal Revenue would be an usurpation of the renegotiation powers.

Such an allocation by the Commissioner would not extend the renegotiation involved or infringe upon the Renegotiation Board's powers. The renegotiation agreement merely fixes the portion of reported profits from Government contracts which are excessive and sets out the terms of repayment. The tax consequences of the determination of excessive profits are controlled by the Internal Revenue Code, not by the renegotiation agreement. While the agreement sets out a tax credit [5] as a set-off against

4. Computations After Renegotiation as Computed by Revenue Agent

| Year | Excess Profits Net Income | Excess Profits Credit | Adjusted Excess Profits Net Income | Unused Excess Profits Credit |
|---|---|---|---|---|
| 1951 | $3,621,232.95 | $3,905,886.84 | | $ 284,653.89 |
| 1952 | $5,646,164.72 | $4,977,719.72 (plus unused credit) | $ 383,791.11 | |
| 1953 | $8,871,351.97 | $5,828,950.73 | $3,042,401.24 | |
| 1954 | $7,885,749.23 | $5,959,545.83 | $1,926,203.40 | |

5. Article 3 of the Renegotiation Agreement provides as follows:
" * * * The amount by which the taxes of the Contractor for the fiscal year under review payable under Chapters 1, 2A and 2D of the Internal Revenue Code are decreased by reason of the application of Section 3806 of the Internal Rev-

profits agreed to be eliminated, that proviso does not determine tax liability. Stow Mfg. Co. v. Commissioner, 190 F.2d 723 (CCA 2, 1951) cert. denied 342 U.S. 904, 72 S.Ct. 295, 96 L.Ed. 677.

McDonnell objected to the introduction of any evidence which tended to show that part of the excessive profits are attributable to years other than 1951. Plaintiff objected to the consideration of any of the paragraphs of the stipulation and supporting exhibits relating to the transactions leading up to the renegotiation agreement. The objection was made as follows:

"Plaintiff objects, on the grounds of irrelevance, immateriality or incompetency, to any and all matters contained in the Stipulation of Facts and the exhibit and sub-exhibits thereto, which were said, written or done in negotiations leading up to the renegotiation agreement or showing how the renegotiation agreement was reached or which would tend to vary, modify or interpret the terms of the renegotiation agreement."

The briefs suggest that McDonnell's objection is based upon the parol evidence rule. The rule does not exclude the facts set out in the stipulation which are subject to the objection. The evidence set out therein is not offered to vary or contradict the agreement, nor does it change its legal effect. The stipulated facts establish the connection of the agreement with this case, describe the subject matter of the agreement and portray the factual situation existing during the years in question to which the proper sections of the Internal Revenue Code must be applied. The ultimate decision of the Court disposes of the plaintiff's objection as to materiality or relevancy.

The Renegotiation Board was required by the Act to give favorable recognition to efficiency considering quantity and quality of production, reduction of costs, economy in the use of materials, facilities and manpower, and was to consider the profits in the light of the following factors: reasonableness of costs and profits, net worth, risk assumed, contribution to the defense effort, character of the business and such other factors as the public interest and fair and equitable dealing may require. 50 U.S.C. Appendix 1952 ed. § 1213. The representatives of McDonnell who negotiated with the Board understood that McDonnell's reported profits were viewed favorably with regard to all of the statutory factors except reasonableness of profits and comparison of profits with net worth. McDonnell sought to make clear that the profit-net worth ratio should not be interpreted by the Board without considering the fact that profits were bunched because of the change of accounting methods.

The reports to the Renegotiation Board show that the contracts on which the renegotiable profits accrued were work in process during the years 1949, 1950 and 1951. Profits from two of the major contracts are shown by McDonnell as totaling more than $9,400,000.00. Over $5,500,000.00 of those profits had been attributed by McDonnell for excess profits tax purposes to the years 1949 and 1950.

The Special Accounting Agreement between McDonnell and the Renegotiation Board is further evidence that the excessive profits are partially attributable to the profits arising out of work performed in 1949 and 1950. By that agreement certain costs, totaling $1,054,684.-00, which were incurred and deducted for income tax purposes in the years 1948, 1949 and 1950, were brought forward and treated as costs in the renegotiations for fiscal year 1951. For excess profits tax purposes, in accordance with McDonnell's § 455(b) election, these

enue Code has been computed by the Internal Revenue Service, based upon the assessments made to the date of such computation, to be the sum of Seven hundred fifty six thousand, fifty-nine and

eighty six one hundredths $756,059.86) Dollars. Such amount will be allowed as a credit against the amount of profits agreed in Article I hereof to be eliminated * * *".

costs were attributed to the respective years in which they were deducted.

All of the evidence points to the conclusion that the $1,450,000.00 of excessive profits were partially attributable to profits reported on work performed in 1949 and 1950 on the renegotiated contracts as well as profits computed on percentage of completion basis for 1951.

It is not disputed that Section 3806, as applicable to this case, provides for a decrease in net income for all tax purposes for the year 1951. The dispute concerns whether it requires the reduction of the base period income by the excessive profits attributable to work performed in the years 1949 and 1950 in order to recompute the excess profits credit.

McDonnell argues that the renegotiation is a subsequent event which can affect only the taxable year referred to in the statute as "the prior taxable year". McDonnell relies heavily on the fact that the word "year" is used in the singular in Section 3806, and that since the renegotiation was on a single fiscal year basis, a plural meaning could not have been intended.

Section 3806 cannot be read strictly in the terms of the Renegotiation Act without requiring a change of wording. The words "contract", "subcontract", and "price" must, in many instances, be interpreted to mean "contracts", "subcontracts" and "prices". This follows because the Renegotiation Act requires the renegotiation to be on a fiscal year basis rather than on individual contracts. It allows the balancing of large profits on certain contracts with inadequate profits or losses on other contracts. In contrast, Section 3806 speaks of renegotiation in respect to "such contract" and amounts "received or accrued under such contract" and "the part of the contract or subcontract price which was received or accrued for the prior taxable year shall be reduced * * *". A strict reading of Section 3806 would require the allocation of the excessive profits eliminated to the particular contracts for the taxable year in which received or accrued. The reduction is from the contract price received or accrued rather than the income reported. The effect of the reduction, then, would be to re-determine net income as it would have been determined had there been no excessive profits.

McDonnell interprets "taxable year (hereinafter referred to as 'prior taxable year')" to mean the year renegotiated. The government interprets the statutory "taxable year" with reference to the accounting method used for the purposes of each relevant tax. The government argues that for determining normal tax, "taxable year" means 1951 only, because McDonnell was required to accrue all of the profits on contracts uncompleted as of June 30, 1950, in 1951 for normal tax purposes in addition to profits based on the percentage of completion of contracts on which work was performed solely in 1951. For excess profits tax purposes, however, "taxable year" refers to 1949, 1950 and 1951 because in all three years profits on contracts uncompleted at June 30, 1950, accrued for excess profits tax computations.

The meaning of the phrase "taxable year" suggested by the context is "the taxable year in which the excessive profits were received or accrued". In a situation where profits were reported for renegotiation on a different accounting basis than was used for income tax reporting, the profits might accrue in years other than the year renegotiated. The directive of Section 3806 would, in that event, require deduction of the excessive profits in years in which the income and expenses were reported for income tax purposes. Midvale Co. v. United States, 124 F.Supp. 678, 129 Ct.Cl. 483; Holmes Projector Co. v. United States, 105 F. Supp. 690, 123 Ct.Cl. 278.

The Midvale case, supra, was discussed at length by both parties and outlines the steps for application of Section 3806. That case involved an action for refund of excess profits taxes and deficiency interest paid by plaintiff for the years 1940–1945. The Court of Claims held that profits received during the base period years 1936–1939 under government

contracts which were renegotiable under the Vinson Act and which profits were required to be repaid in subsequent years should be excluded from income in the base period years for purposes of determining excess profits tax for the years 1940–1945.

That case differed from this case in several respects. In Midvale, the Vinson-Trammel Act, a predecessor to the Renegotiation Acts, was involved. The taxpayer, who had reported income from long-term contracts for income tax purposes on a percentage of completion basis, was required to report the renegotiable income on a completed contract basis for purposes of the Vinson Act. In that case the excessive profits were determined for the base period years rather than subsequent taxable years. Section 3806 had been enacted prior to the decision in Midvale but was not applicable to renegotiations under the Vinson Act. The Court of Claims, however, stating that Section 3806 was a codification of prior procedure interpreted and applied the words of the statute.

The Court's holding in Midvale is based in part upon Section 711(b) (1) of the Code which defined excess profits net income for the base years to be "normal-tax net income, as defined in section 13 (a)". Therefore, the excessive profits were required to be eliminated from the base years to determine normal tax income for those years from which the excess profits credit was to be recomputed.

The comparable definition in this case is Section 433(a) [6] which defines excess profits net income as "normal-tax net income, as defined in section 13(a) (2), for such year increased or decreased by the following adjustments * * *". In line with the reasoning of Midvale, the excessive profits involved here accrued for normal-tax purposes in 1951 and must be deducted from 1951 income to determine correct normal-tax income for that year. Then, following the definition, the corrected normal-tax net income must be increased or decreased by the relevant listed adjustments which, in this case, means the irrevocable election of the taxpayer under Section 455(b). The portion of the $1,450,000.00 in excessive profits attributable to 1949 and 1950 would be excluded from the base period net income because of the Section 455(b) adjustment under Section 433(a).

Midvale is authority for the exclusion of a part of the excessive profits from 1949 and 1950 only in this sense: It holds that the Section 3806 exclusion of profits from income in the year from which they had been accrued must be given effect for all tax purposes. Therefore, reference must be had to Sections 433(a) and 433(b) to determine the result of applying Section 3806. The Commissioner's interpretation that the "taxable year", as used in Section 3806, must be read with reference to the accounting method used for computing each tax (normal tax and excess profits tax), is,

---

6. Section 433 provides:

  "§ 433.  Excess profits net income

  "(a) Taxable years ending after June 30, 1950. The excess profits net income for any taxable year ending after June 30, 1950, shall be the normal-tax net income, as defined in section 13(a) (2), for such year increased or decreased by the following adjustments:

  "(1) Adjustments. * * *

  "(Q) Income from installment sales, long-term contracts, etc. For adjustment, in the case of a taxpayer making an election provided in section 455, with respect to income derived from installment sales, installment sales obligations, or long-term contracts. * * *

  "(b) Taxable years in base period. For the purposes of computing the average base period net income, the excess profits net income for any taxable year shall be the normal-tax net income, as defined in section 13(a) (2) as in effect for such taxable year, increased or decreased by the following adjustments. * * *

  "(8) Long-term contracts. In the case of a taxpayer which has made the election provided in section 455(b), income from long-term contracts shall be computed under the percentage of completion method and as if the taxpayer had reported such income on the percentage of completion method for all taxable periods. * * *"

in effect, another approach to the same result.

In conclusion, therefore, it is the holding of this Court that Section 3806 requires the excessive profits to be deducted in the year in which they accrued for all tax purposes. The excessive profits should be, as the parties agreed, reduced from income reported for 1951 to determine correct normal tax income and tax liability. That part of the excessive profits attributable to work performed in 1949 and 1950 on contracts uncompleted at June 30, 1950, then must be allocated to reduce the average base period net income for the years 1949 and 1950 to compute the correct excess profits credit pursuant to the Section 433(a) (1) (Q) and 433(b) (8) adjustments in accordance with McDonnell's Section 455(b) election.

The Commissioner's computation allocating $657,865.00 of the excessive profits to the base period years is based upon sales value of work performed on government contracts prior to June 30, 1950. The reports of McDonnell to the Renegotiation Board show that profits with respect to two major contracts were attributable to the base years in a percentage in excess of the Commissioner's figure. McDonnell has consistently maintained that no allocation should be allowed and has not attempted to prove the Commissioner's determination of amount as in error. Therefore, in view of the Court's holding and McDonnell's position, the Commissioner's determination is presumptively correct. Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212; Helvering v. Taylor, 293 U. S. 507, 55 S.Ct. 287, 79 L.Ed. 623.

The Court's holding is consistent with the purposes of the Acts involved. The Renegotiation Act made possible the abandonment of long drawn-out negotiations by allowing for good faith estimates at the time of entering into war-time contracts without losing the incentives for efficiency. The initial-price contract with provision for later adjustment offered the greatest incentive. See Lichter v. United States, 334 U.S. 742, 763–768, 68

S.Ct. 1294, 92 L.Ed. 1694. The intention of Congress in enacting Section 3806 was to tax the full amount of earnings under Government contracts "in the year in which such amounts were earned by performance and were payable or paid, in accordance with the accrual or cash basis method of accounting * * *", and then to give mitigating effect upon renegotiation by readjustment in accounting, and reassessment of tax liability. Holmes Projector Co. v. United States, supra. The result serves the purpose of the Renegotiation Act and the excess profits tax law by placing the taxpayer in the same position profit-wise and tax-wise as it would have been had there been no excessive profits.

The foregoing memorandum is adopted by the Court as its findings of fact and conclusions of law, and the Clerk is directed to enter judgment accordingly.