McDONNELL AIRCRAFT CORPORA-
TION, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 17407.

United States Court of Appeals
Eighth Circuit.

March 9, 1965.

Rehearing Denied April 22, 1965.

William H. Charles, of Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., made argument for the appellant and filed brief with John Peters MacCarthy, of Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo.

Mildred L. Seidman, Atty., Tax Div., Dept. of Justice, Washington, D. C., made argument for appellee and filed brief with Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., Lee A. Jackson and Harry Marselli, Attys., Tax Division, Dept. of Justice, Washington, D. C., and Richard D. FitzGibbon, Jr., U. S. Atty. and John A. Newton, Asst. U. S. Atty., St. Louis, Mo.

Before VAN OOSTERHOUT, BLACK-MUN, and MEHAFFY, Circuit Judges.

BLACKMUN, Circuit Judge.

The issue here is the refundability of approximately a half million dollars in federal excess profits taxes, plus interest thereon, paid by McDonnell Aircraft Corporation for its fiscal years ended June

30, 1952, 1953, and 1954. The case was tried to the court and was submitted on the pleadings and a stipulation. The district court entered judgment for the United States. Its supporting opinion is at 218 F.Supp. 640. The Internal Revenue Code of 1939, of course, controls[1] and section references herein, unless otherwise indicated, are to that Code.

McDonnell is a corporation organized in 1939. It is engaged, among other things, in the business of manufacturing and selling airframes for aircraft. During the taxable years in question more than 90% of its income was derived from government contracts. It kept its books on the accrual basis and filed returns for the fiscal year ended June 30.

McDonnell derived income from many contracts which required more than one year to complete. Under the Code, §§ 41 and 42(a), and under § 29.42–4 of Regulations 111, taxpayer, for fiscal 1950 and prior years, elected, for income tax purposes, to report its gross income from these "long-term contracts" upon the completed contract method of accounting. By this method income and expenditures are reported only in the year in which the contract is completed.

For fiscal 1951, however, taxpayer effected a change in this reporting method. With the approval of the Commissioner, granted pursuant to §§ 29.42–4(b) and 29.41–2(c) of the same Regulations, McDonnell changed from the completed contract method of accounting for long-term contracts to the percentage of completion method. By the latter a taxpayer reports for the year that percentage of total gross income to be derived from the contract as the work completed during the year bears to all the work to be performed under the contract, and expenditures of the year are deducted. As a condition for this change, however, the Commissioner required McDonnell, among other things, to agree to report in fiscal 1951 all the income from any contract completed during that taxable year and, with respect to a contract not yet completed in that year, the appropriate percentage of income from the very beginning of the contract. Taxpayer accepted this condition and changed to percentage of completion accounting for all purposes.

This accounting change naturally resulted in the gathering or bunching in fiscal 1951 of a substantial amount of income not theretofore reported by the taxpayer under its formerly employed completed contract method. For the year McDonnell reported normal tax net income of almost $11,000,000. Of this amount something more than $4,000,000 was attributable to percentage of completion in fiscal 1951 but more than $6,000,000 to work performed in fiscal 1949 and fiscal 1950 but theretofore unreported. The accounting change thus threw this additional amount of more than $6,000,000 into fiscal 1951. Its effect on normal and surtax is not at all in issue here.

For McDonnell's fiscal years 1951 through 1954, inclusive, (more accurately, for the period from July 1, 1950, through December 31, 1953), the Excess Profits Tax Act of 1950 [Korean Hostilities], 26 U.S.C. §§ 430–474, was in effect. This imposed an excess profits tax in addition to regular corporation normal and surtaxes.

As is generally characteristic of excess profits tax laws, the 1950 Act was designed to reach only that portion of a corporate taxpayer's income attributable to the special wartime conditions, as distinguished from its normal peacetime profits. Fardale Corp. v. United States, 175 F.Supp. 175, 177, 146 Ct. Cl. 532 (1959). This was accomplished by granting the taxpayer an excess profits credit against excess profits net income. This credit was intended to reflect normal profit and the excess profits tax was to attach only to the remainder. If a taxpayer enjoyed less than normal income in a particular year, the excess profits credit not used in that year could

1. See Internal Revenue Code of 1954, § 7851(a) (1) (A).

be carried over and added to the credit available in the next year and thus utilized to offset any excess profits income of that succeeding year. There were also unused excess profits carryback provisions. Sections 430–432.

The 1950 Act provided two methods of computing the excess profits credit. A taxpayer could select the one which resulted in the lesser tax. Section 434 (a). One method, prescribed by § 436 and succeeding sections, was based on invested capital and is of no concern here. The other method, prescribed by § 435 and which McDonnell selected, was based on income. By this method the excess profits credit was related to average income during a portion of a period of presumed normal experience for the taxpayer. This base period was defined, § 435(b), with stated exceptions, as the four calendar years 1946–49. Section 435(e), however, provided special relief for a taxpayer whose business had substantial growth during that base period. This was of advantage to McDonnell and its base period accordingly consisted of only its two fiscal years 1949 and 1950.

For its fiscal 1951 return McDonnell elected for excess profits tax purposes, as it was allowed to do under § 455(b), to compute income from long-term contracts on the percentage of completion method.[2] This corresponded to the general accounting change hereinabove described. It resulted, after initial audit and accepted adjustments, in normal-tax net income of $11,079,127.79 and excess profits net income of $4,373,761.20. The difference between these figures was due to work performed in fiscal 1949 and

1950 (when the excess profits tax was not in effect) on long-term contracts uncompleted by June 30, 1950. The difference was therefore excluded in computing 1951 excess profits net income.

For fiscal 1949 and 1950 McDonnell was subject to renegotiation under the Renegotiation Act of 1948, 62 Stat. 259, 50 U.S.C. App. § 1193. For those years it employed the completed contract accounting method for long-term contracts for both renegotiation and for tax purposes. It received renegotiation clearances, that is, a determination that no excessive profits existed, for both years.

For fiscal 1951, which was divided between calendar 1950 and 1951, McDonnell was subject to renegotiation under the 1948 Act and also the Renegotiation Act of 1951, 65 Stat. 7, 50 U.S.C. App. §§ 1211–33. However, as provided by § 102(c) of the 1951 Act, 50 U.S.C. App. § 1212(c), it was agreed by the parties that the 1951 Act was to apply to the entire fiscal year. Here, again, the same method of accounting was employed for both renegotiation and tax purposes but this time it was percentage of completion accounting.

In September 1955 McDonnell and the government executed a renegotiation agreement by which excessive profits to be eliminated for fiscal 1951 were fixed at $1,450,000. Under § 3806(a) (1) of the 1939 Code, as added by the Revenue Act of 1942, § 508, 56 Stat. 964, and thereafter amended, this amount of eliminated excessive profits for fiscal 1951 operated to reduce the taxpayer's accrued income on its government contracts for that year[3] and, accordingly,

---

**2.** Section 455(b). "Any taxpayer computing income from contracts the performance of which requires more than 12 months may elect, in its return for the taxable year, for the purposes of the tax imposed by this subchapter, to compute, in accordance with regulations prescribed by the Secretary, such income upon the percentage of completion method of accounting. * * * The net income of the taxpayer for each year to which this subchapter is applicable prior to- the year with respect to which the election is made

shall be adjusted for the purposes of this subchapter. * * *"

**3.** Section 3806(a) (1). "In the case of a contract with the United States * * * which is made by the taxpayer, if a renegotiation is made in respect of such contract * * * and an amount of excessive profits received or accrued under such contract * * * for a taxable year (hereinafter referred to as 'prior taxable year') is eliminated and * * * the taxpayer is required to pay or re-

resulted in a decrease of McDonnell's income tax and the elimination of excess profits tax for fiscal 1951. Under § 3806(b) (1), however, the amount of the reduction in tax constitutes a credit against the excessive profits eliminated. This credit was determined by the Internal Revenue Service to be $756,059.86 and was specified in the renegotiation agreement. Its amount is not in dispute. The net of $693,940.14 (the difference between the eliminated excessive profits of $1,450,000 and the credit of $756,059.86) was paid by McDonnell in October 1955.

The crux of the present case, as the district court pointed out, p. 642 of 218 F.Supp., is the proper treatment of the eliminated excessive profits in the determination of the taxpayer's excess profits tax liability. McDonnell would apply the entire $1,450,000 as a deduction in the determination of its fiscal 1951 excess profits net income. The government, on the other hand, would allocate that amount, on a sales proration basis, among fiscal 1951 and, as well, the two base period years of 1949 and 1950 during which work on long-term contracts not completed by June 30, 1950, was performed. The taxpayer's position would affect, in its favor, the unused excess profits credit for fiscal 1951 eligible for carryover. The government's allocation would result in decreased base period net income and in decreased excess profits credit. The details of these respective approaches are set forth in footnotes 3 and 4 of the district court's opinion, pp. 643–644 of 218 F.Supp.

Thus, despite the usual complicated fact situation attendant upon an excess profits tax case, the issue before us perhaps is comparatively simple and is one triggered by McDonnell's statutorily permitted change of accounting for its long-term contract income. The government would phrase the issue thusly: whether part of the excessive profits eliminated by renegotiation is allocable to the base period years and, for excess profits tax purposes, is to be eliminated from all the years in which accrued. McDonnell says that this approach begs the question and that the issue is whether the district court was correct in concluding that excessive profits can be accrued for years for which no determination of excessive profits was ever made.

The trial court, p. 644 of 218 F.Supp., described the issue as two-fold, namely, is a portion of the excessive profits so negotiated attributable to fiscal 1949 and 1950, and, if so, does § 3806 require that portion to be allocated to those years for purposes of computing the excess profits credit? It gave an affirmative answer to both questions. In doing so, it found, p. 646, that part of the eliminated $1,450,000 in excessive profits was attributable to work performed in fiscal 1949 and 1950 (a finding as to which there is no dispute), and reasoned, pp. 646–648, that § 3806 "cannot be read strictly in the terms of the Renegotiation Act without requiring a change of wording"; that the Act's use of the singular in many places must be interpreted to mean the plural; that excessive profits attributable to work performed in the base years on contracts uncompleted at June 30, 1950, must reduce base period net income; that this is required under § 433(a) (1) (Q)[4]

pay to the United States * * * the amount of excessive profits eliminated, * * * the part of the contract * * * price which was received or was accrued for the prior taxable year shall be reduced by the amount of excessive profits eliminated. * * *"

4. Section 433(a). "The excess profits net income for any taxable year ending after June 30, 1950, shall be the normal-tax net income * * * increased or decreased by the following adjustments:
"(1) * * * (Q) * * * For adjustment, in the case of a taxpayer making an election provided in section 455, with respect to income derived from installment sales, installment sales obligations, or long-term contracts, see section 455."

and (b) (8)[5] because of McDonnell's § 455(b) election; that the excessive profits must "be deducted in the year in which they accrued for all tax purposes"; and that this "holding is consistent with the purposes of the Acts involved" and places the taxpayer "in the same position profit-wise and tax-wise as it would have been had there been no excessive profits."

We, of course, must start with the three statutes which are so pertinent here:

A. The Renegotiation Act of 1951. Section 101, 50 U.S.C. App. § 1211, contains a declaration by Congress "that sound execution of the national defense program requires the elimination of excessive profits from contracts made with the United States". By § 102(a), 50 U.S.C. App. § 1212(a), the 1951 Act is applicable "to the extent of the amounts received or accrued by a contractor" on or after January 1, 1951, even though the particular contract was made prior thereto (with the exception hereinabove noted, § 102(c), as to the parties' subjecting the entire fiscal year 1951 to the 1951 Act). Section 103(e), 50 U.S. C. App. § 1213(e), defines excessive profits and provides that, in determining these, "favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration" reasonableness of costs and profits, net worth, extent of risk assumed, nature and extent of contribution to the defense effort, character of business, and "other factors the consideration of which the public interest and fair and equitable dealing may require". The renegotiation year is generally identified with the contractor's taxable year and renegotiation accounting with that employed by the contractor in keeping his records. Section 105, 50 U.S.C. App. § 1215, provides that the Renegotiation Board "shall exercise its powers with respect to the aggregate of the amounts received or accrued during the fiscal year (or such other period as may be fixed by mutual agreement) by a contractor * * * and not separately with respect to amounts received or accrued under separate contracts" unless otherwise requested by the contractor. With stated exceptions, one holding a contract subject to renegotiation is to file, by a specified time after the close of his fiscal year, a financial statement with such information as the Board prescribes. There is a minimum "received or accrued during a fiscal year" for renegotiation.

Two features of the 1951 Act are impressive. The first is that it speaks in annual terms and consistently directs itself to the fiscal year. Renegotiation is thus on a yearly base and not, except by request of the contractor, on a contract base. This, in fact, has been described as "a mandatory obligation". Brown & Williamson Tobacco Corp. v. United States, 201 F.2d 819, 822 (6 Cir. 1953). The second is the emphasis upon essentially subjective elements in the determination of excessive profits. Favorable recognition is to be given to efficiency as demonstrated by production, costs, economy, and other factors mentioned above. It should be obvious that these subjective elements, even for the same contractor, may well vary from year to year.

B. The Renegotiation Act of 1948. This statute, 50 U.S.C. App. § 1193, is confined to airplane contracts. The Secretary of Defense is authorized to re-

---

5. Section 433(b). "For the purposes of computing the average base period net income, the excess profits net income for any taxable year shall be the normal-tax net income * * * increased or decreased by the following adjustments * * *

"(8) * * * In the case of a taxpayer which has made the election provided in section 455(b), income from long-term contracts shall be computed under the percentage of completion method and as if the taxpayer had reported such income on the percentage of completion method for all taxable periods."

negotiate "for the purpose of eliminating excessive profits". The Secretary's powers shall be exercised with respect to the aggregate of amounts under all such contracts with the contractor "during his fiscal year or upon such other basis as may be mutually agreed upon". A minimum is specified. Here, again, the emphasis is upon the year and not upon the contract. It is of interest to note that the subjective features which appear in the 1951 Act were not present in the 1948 Act. They were set forth, however, in regulations. 32 C.F.R. (Rev. 1954), §§ 1424.401–.416.

C. Section 3806 of the Internal Revenue Code of 1939. The applicable portions of § 3806(a) (1) are quoted in footnote 3, supra. Section 3806(b) (1) provides that "There shall be credited against the amount of excessive profits eliminated the amount by which the tax [income, excess profits and others] for the prior taxable year * * * is decreased by reason of the application of paragraph (1) of subsection (a) * *." Here again it is evident and seemingly important that the statute speaks in terms of the taxable year and an amount of excessive profits "for a taxable year"; that the contract price for that year is reduced by the amount eliminated; and that the amount eliminated and repayable is credited with the decrease in tax for the year.

Thus the 1951 Renegotiation Act and § 3806 of the 1939 Code and, for that matter, the 1948 Renegotiation Act, all emphasize the year as a unit and give no emphasis to a particular contract or contracts as the measure either of renegotiation, of tax credit or of tax computation.

 All this would prompt us to conclude that the attention and the intent of Congress in enacting these statutes was directed to the renegotiation year. As applied here, this is McDonnell's fiscal year 1951; it is not its fiscal years 1949, 1950, and 1951.

But in addition to this emphasis-upon-the-year character of the governing statutes, there are other factors which lead us to disagree with the conclusions of the district court:

1. "Excessive profits", within the meaning of the Renegotiation Acts, and "excess profits net income", within the meaning of the excess profits tax law, are distinct and different concepts and are by no means identical. Section 3806 carries no contrary implication. We suspect that much of the confusion here is occasioned by an unintended and unjustified identification of the two. In a given situation, one may exist without the other. Indeed, for fiscal June 30, 1949 and 1950, renegotiation and excessive profits for a contractor were possible, but no excess profits tax was in existence.

2. There has been no determination by renegotiation that McDonnell had excessive profits for fiscal 1949 and 1950. In fact, it had received a renegotiation clearance for each of those years. It is true that McDonnell's 1951 renegotiable profits included an amount which would have been subject to renegotiation for fiscal 1949 and 1950 if the taxpayer had employed the percentage of completion method of accounting for income from long-term contracts in those years. But the "if" is a big one. That accounting method was not then employed. The use of the method for fiscal 1951 and the condition imposed by the Commissioner in order to use it resulted in greatly increased reportable income for fiscal 1951 and in the profits which were renegotiable for that year. And, most important, any concession that renegotiable profits might have existed for the two preceding years under a different accounting method does not lead inevitably to the conclusion that excessive profits for those years did in fact exist or, even if they did, that they would have aggregated, with 1951, the same determined amount of $1,450,000. The renegotiation of 1951 did not embrace or constitute renegotiation for 1949 and 1950. The government in its brief acknowledges "that the agreement was for 1951", and that "it determined that excessive profits of $1,450,000 had been derived in that year". This is far dif-

ferent from an agreement for 1949 and 1950 and a determination that excessive profits had been derived in those years.

3. A contrary conclusion would have the effect of nullifying, and without further renegotiation, the renegotiation clearances already issued to McDonnell for fiscal 1949 and 1950.

4. Despite the known possibility of renegotiation in a given situation, the basic integrity of annualization for tax purposes has been preserved. Holmes Projector Co. v. United States, 105 F. Supp. 690, 123 Ct.Cl. 278 (1952) cert. denied 344 U.S. 912, 73 S.Ct. 334, 97 L.Ed. 703; Junior Toy Corp. v. United States, 116 F.Supp. 730, 126 Ct.Cl. 681 (1953), cert. denied 348 U.S. 815, 75 S.Ct. 26, 99 L.Ed. 643; National Forge & Ordnance Co. v. United States, 151 F.Supp. 937, 939, 139 Ct.Cl. 204 (1957); Continental Foundry & Machine Co. v. United States, 159 F.Supp. 608, 612, 141 Ct.Cl. 604 (1958).

5. The 1951 renegotiation was conducted in the light and atmosphere of the statutorily enumerated factors. These, as we have noted, are essentially subjective. The statute, as the government concedes, thus denies strict formulation in renegotiation. The record indicates that McDonnell's only unfavorable factors for fiscal 1951 were reasonableness of profits and return on net worth. A claim that there were excessive profits for both fiscal 1949 and 1950 in turn presupposes unfavorable subjective factors for those years. Yet the same subjective factors, and the same relative extent thereof, are not automatically existent for those years. In the absence of further renegotiation, it is pure speculation to say that McDonnell had then realized excessive profits of specified amount.

6. The renegotiation agreement itself speaks of "profits derived by the Contractor during its fiscal year ended June 30, 1951". It states that the profits to be eliminated were represented by McDonnell as having been included in its returns for fiscal 1951. Here, again, is annualization and a focus upon the particular year by the parties themselves.

7. Among the conditions imposed by the Commissioner in permitting the taxpayer to change for fiscal 1951 to percentage of completion accounting was that the taxpayer agree "that the use of the percentage of completion basis on long-term fixed price contracts shall have no effect on the completed contract basis previously used by you in reporting income from such contracts for prior years".

Both parties emphasize Midvale Co. v. United States, 124 F.Supp. 678, 129 Ct. Cl. 483 (1954), and each would derive comfort from it. The taxpayer there sued for refund of excess profits taxes and interest paid for 1940–45. The Excess Profits Tax Act of 1940 (World War II), 54 Stat. 975, as amended, and the Vinson-Trammell Parity Act, 48 Stat. 503, as amended, a predecessor of the more recent renegotiation acts, were applicable. The taxpayer had received, under the Vinson Act, excessive profits during its base period years 1936–39. These were subsequently repaid. The question was whether the profits should be excluded from income for the base period years in determining the taxpayer's excess profits credit used in the determination of its excess profits tax for 1940–45. The taxpayer was on the accrual method and reported income on its long-term contracts on the percentage of completion basis. The Vinson Act required, however, the determination of excessive profits on the basis of contracts completed within the year. The court held that the Vinson Act excessive profits of the base period years should be excluded from income of those years in determining the excess profits credit. In reaching this conclusion it referred to § 3806 of the 1939 Code and to the 1942 renegotiation act, 56 Stat. 245, as amended, although neither was applicable to the case. The court suspended initial judgment pending computational corrections. Later a supplemental opinion was filed and judgment entered. 138 F.Supp. 269, 133 Ct.Cl. 881.

The Midvale case differs from the present one in that (a) statutes of different character were involved: under the Vinson Act, profits were automatically excessive to the extent they exceeded ten percent of the contract price, there were no statutory subjective factors, and renegotiation was directed to contracts, not to years; (b) excessive profits were determinable under the Vinson Act on the completed contract basis even though the taxpayer filed its tax returns on the percentage of completion basis; and (c) there was a determination of excessive profits for the base period years rather than, as here, only for a later year. We regard Midvale as interesting, as distinguishable on its facts, and as by no means constituting a precedent adverse to our conclusion here.

Some additional observations are perhaps in order:

1. The permission granted by § 455 (b) to elect to compute the long-term contract income upon the percentage of completion method has been accorded to taxpayers as far back as the Revenue Act of 1942. Section 222(d) of that Act. As the government points out, this evidently came about because of a recognition at that time that the completed contract method could produce a distorted and, for the taxpayer, an unfavorable result depending upon the completion dates of its contracts. 1 Senate Hearings on Revenue Act of 1942, pp. 367–70; S.Rep. No. 1631, 77th Cong., 2d Sess., pp. 208–09; H.Rep. No. 3142, 81st Cong., 2d Sess., p. 14; S.Rep. No. 2679, 81st Cong., 2d Sess., p. 15; 7A Mertens, Law of Federal Income Taxation § 42.60. The government asserts that the "obvious desire was to place such taxpayers in the same position, for excess profits tax purposes, as those who were reporting on the percentage of completion method right along". This may well be. The government, however, would further assert that it is now only reasonable and logical to make the same adjustment in the case of a taxpayer electing under § 455(b) as would be made were the taxpayer consistently employing the percentage of completion method, that is, "to eliminate such renegotiated profits from the income of the base period years * * * as well as from the income for the year or years subject to the excess profits tax". But here, again, the answer is the fact that the excessive profits were determined by renegotiation to exist for fiscal 1951 and not for fiscal 1949 and 1950.

2. We see nothing in Overlakes Corp., 41 T.C. 503 (1964), cited by both parties and decided since the resolution of the present case in the district court, which justifies any departure from the issues as they were framed at trial.

3. If there is an element of excess profits tax windfall here for McDonnell, a conclusion at which we do not necessarily arrive, it is attributable (a) to the fact that renegotiation resulted in elimination of profits for only fiscal 1951 and not at all for 1949 and 1950, and (b) to the provisions of §§ 455 and 433 of the 1939 Code. The latter, however, is statutory language which is not for us to override. Lewyt Corp. v. Commissioner, 349 U.S. 237, 240, 75 S.Ct. 736, 99 L.Ed. 1029 (1955); Hanover Bank v. Commissioner, 369 U.S. 672, 687–688, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962).

4. Although the situations are quite different, there is at least some parallel between the conclusion we reach here and this court's decision in United States v. Whitney Land Co., 324 F.2d 33 (8 Cir. 1963). That case concerned a carryback computation and the effect thereon of different statutory standards under the 1939 and 1954 Codes. We gave emphasis to the taxable year in question and its governing statute. Here the emphasis is on fiscal 1951.

The case is not an easy one but we conclude that the entire $1,450,000 of excessive profits eliminated for fiscal 1951 serves to reduce the plaintiff's excess profits income for that fiscal year. The judgment of the district court is reversed and the case is remanded for the entry of an appropriate judgment in favor of the plaintiff.